*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0142p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

JOSEPH JEROSS (06-2257) and KATHLEEN
DOCHERTY (06-2502),

        *Defendants-Appellants.*

Nos. 06-2257/2502

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-81150—John Feikens, District Judge.

Argued: January 31, 2008

Decided and Filed: April 4, 2008

Before: MERRITT, GILMAN, and COOK, Circuit Judges.

---

### COUNSEL

**ARGUED:** Joan E. Morgan, Sylvan Lake, Michigan, Andrew N. Wise, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellants. Carl D. Gilmer-Hill, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Joan E. Morgan, Sylvan Lake, Michigan, Andrew N. Wise, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellants. Carl D. Gilmer-Hill, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

       GILMAN, J., delivered the opinion of the court, in which COOK, J., joined. MERRITT, J. (pp. 20-22), delivered a separate dissenting opinion.

---

### OPINION

---

       RONALD LEE GILMAN, Circuit Judge. In April of 2003, Joseph Jeross and Kathleen Docherty pled guilty to, and were later sentenced for, their roles in a Detroit-based conspiracy to possess and distribute at least 100,000 Ecstacy pills. Jeross was sentenced to 270 months in prison and Docherty was sentenced to 188 months in prison. Their sentences were later vacated and remanded by this court following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005). On remand, the district court imposed the same sentences, which Jeross and Docherty now challenge on numerous grounds.

1

Both Jeross and Docherty argue that the district court used an incorrect version of the U.S. Sentencing Guidelines (USSG), improperly extrapolated the total weight of the 100,000 Ecstacy pills from the actual weight of a smaller number of pills actually recovered in the investigation, and denied them the opportunity to personally address the court at their resentencing hearings. Jeross separately contends that the district court sentenced him above the statutory maximum term in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), failed to apply a three-level reduction to his base offense level for acceptance of responsibility, and did not inquire at his resentencing hearing into whether he and his attorney had had the opportunity to review and discuss his Presentence Report (PSR). He also asks that we reassign his case to a different district court judge upon further remand. Docherty, for her part, argues that the district court erred in holding her responsible for 100,000 pills of Ecstacy and in increasing her base offense level on the ground that she was a manager in the conspiracy. For the reasons set forth below, we **AFFIRM** the sentences of both Jeross and Docherty.

## I.  BACKGROUND

In April of 2003, Jeross and Docherty pled guilty to conspiring to possess and distribute Ecstacy pills between December of 2001 and August of 2002, in violation of various federal statutes. Their pleas were entered without Rule 11 plea agreements.

The defendants had been indicted in August of 2002 after several months of investigation, during which Docherty sold several thousand Ecstacy pills to undercover agents. Those pills were tested and found to contain varying combinations and amounts of the controlled substances methylenedioxymethamphetamine (MDMA), methylenedioxyamphetamine (MDA), and methamphetamine ("meth").

Thomas Leto, one of Jeross's and Docherty's coconspirators and codefendants, provided extensive and detailed information about how the conspiracy operated. Leto testified that he traveled with Jeross to Canada several times to pick up the pills and take them back to Docherty's home outside of Detroit, where they were repackaged and distributed. At other times during the conspiracy, Leto said that he distributed drugs for Docherty. He testified that at least 100,000 pills were distributed during his involvement in the conspiracy, a quantity that law enforcement officials corroborated based on (1) approximately $450,000 in cash seized as a result of the investigation, (2) a notebook that Docherty maintained to record the various drug transactions, and (3) statements from other people who were involved in the operation. According to Leto, Jeross financed the operation and paid Docherty a salary to manage the distribution of the drugs through four or five individual distributors.

The basic facts of each defendant's sentencing and resentencing proceedings are summarized below. Facts that are specific to the various issues that Jeross and Docherty raise on appeal are set forth in the corresponding sections of this opinion.

### A.    Jeross's sentence and subsequent resentencing

Jeross pled guilty to violations of 21 U.S.C. §§ 841 and 846 (conspiracy to possess and distribute a controlled substance), 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance), 8 U.S.C. § 2 (aiding and abetting), and 31 U.S.C. § 5324 (structuring transactions to evade reporting requirements). At Jeross's initial sentencing in July of 2004, the district court determined that, under the 2002 Guidelines, his base offense level was 36. The court first found that Jeross was responsible for 100,000 pills, then applied a four-level increase for Jeross's role as a manager in the offense pursuant to USSG § 3B1.1(a), and added another two levels under USSG § 3C1.1 because the court found that Jeross had obstructed justice by threatening Leto on several occasions. In addition, the district court concluded that Jeross was ineligible under USSG

§ 3E1.1 for an acceptance-of-responsibility reduction because of his obstruction of justice. These calculations resulted in a total offense level of 42 and, with a criminal history category of I, a Guidelines range of 360 months to life in prison.

The court sentenced Jeross below the Guidelines range to a total of 270 months in prison, a sentence that was comprised of (1) four concurrent terms of 240 months' imprisonment (the statutory maximum) for his drug-related offenses, and (2) a consecutive term of 30 months' imprisonment for structuring cash transactions to evade reporting requirements. The latter term was below the 60-month statutory maximum prison term for that offense, reflecting the court's grant of the government's motion for a downward departure because of Jeross's substantial assistance in the investigation.

On the government's motion, Jeross's sentence was subsequently vacated and remanded by this court for resentencing in light of *Booker.* At a resentencing hearing in February of 2006, the district court acknowledged that the Sentencing Guidelines are advisory, but imposed the same sentence of 270 months in prison. Jeross timely filed a notice of appeal. Nine months after his reentencing, the district court acknowledged an error in its calculation of Jeross's base offense level during the course of Docherty's resentencing proceedings.

**B.      Docherty's sentence and subsequent resentencing**

Docherty pled guilty to violations of 21 U.S.C. §§ 841 and 846 (conspiracy to possess and distribute a controlled substance), 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance and the actual distribution thereof), and 18 U.S.C. § 2 (aiding and abetting). She was originally sentenced in October of 2003 at the end of a two-day hearing. Based on a finding that Docherty was also responsible for 100,000 pills, the district court applied the 2002 Guidelines and calculated a base offense level of 36. It then added three levels for her role as a manager in the conspiracy pursuant to USSG § 3B1.1(b) and subtracted three levels for her acceptance of responsibility under USSG § 3E1.1(a) and (b)(1). Together with a criminal history category of I, the resulting Guidelines range was 188 to 235 months in prison. The court sentenced her to six concurrent prison terms of 188 months each.

Docherty's sentence was also vacated and remanded by this court in light of *Booker.* At her resentencing hearing in November of 2006, the district court acknowledged that the Guidelines are advisory, not mandatory, but still imposed the original sentence. Docherty timely filed a notice of appeal.

## II. ANALYSIS

**A.      Standard of review**

We review a district court's factual findings in sentencing a defendant under the clearly erroneous standard, *United States v. Hazelwood*, 398 F.3d 792, 795 (6th Cir. 2005), and its application and interpretation of the Guidelines de novo, *United States v. Cousins*, 469 F.3d 572, 575 (6th Cir. 2006). A district court's decision will be found to be clearly erroneous where, having reviewed all of the evidence, we are left with the definite and firm conviction that a mistake has been made. *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999).

The ultimate sentence, however, is reviewed for reasonableness. *United States v. Thomas*, 498 F.3d 336, 339 (6th Cir. 2007). We use the abuse-of-discretion standard to determine whether a defendant's sentence is reasonable. *See United States v. Carter*, 510 F.3d 593, 600 (6th Cir. 2007) (citing *Gall v. United States*, 128 S. Ct. 586, 594-95 (2007) ("Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard.")).

"Review for reasonableness has both procedural and substantive components." *Id.* at 600. The Supreme Court recently explained that the appellate court

> must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.

*Gall*, 128 S. Ct. at 597.

"[W]here a district court makes a mistake in calculating a guidelines range for purposes of determining a sentence under section § 3553(a), we are required to remand for resentencing unless we are certain that any such error was harmless." *United States v. Vicol*, 514 F.3d 559, 561 (6th Cir. 2008). A sentencing error is harmless if we are certain that the error "did not affect the district court's selection of the sentence imposed." *Hazelwood*, 398 F.3d at 801 (quoting *Williams v. United States*, 503 U.S. 193, 203 (1992)). "Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall*, 128 S. Ct. at 597.

### B.      Base offense level calculations

Docherty and Jerross each challenge the way in which the district court calculated their base offense levels. Docherty's arguments are that the district court erred in (1) holding her responsible for at least 100,000 Ecstacy pills, (2) using the wrong version of the Guidelines, and (3) using the weight measurements of the 2,499 pills that she sold to law enforcement officers to extrapolate the weight of all 100,000 pills.

Jeross argues that the district court erred in determining the amount of controlled substances contained in the 100,000 pills for which he was held responsible. Although his attorney indicated during oral argument that Jeross, like Docherty, was contesting the district court's finding that he was responsible for 100,000 Ecstacy pills, his appellate brief states that he "was not contesting the quantity of Ecstacy pills in this case" and was only challenging the weight attributed to those pills. Because he expressly waived a pill-counting objection on appeal and in a reply to the government's resentencing memorandum below, and because he failed to raise it at either of his sentencing hearings, we decline to address the issue here.

A district court's drug-quantity determination is a factual finding that we review under the clearly erroneous standard. *United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004). If the exact amount of drugs is undetermined, "an estimate will suffice, but . . . a preponderance of the evidence must support the estimate." *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990); *United States v. Hernandez*, 227 F.3d 686, 699 (6th Cir. 2000) ("Approximations are completely appropriate."). A district court may not "hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not *actually* responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible." *Walton*, 908 F.2d at 1302 (emphasis in original); *see also Sandridge*, 385 F.3d at 1037 (holding that "the court may make an estimate supported by competent evidence, but that the evidence supporting the estimate must have a minimal level of reliability beyond mere allegation, and the court should err on the side of caution in making its estimate" (citation and internal quotation marks omitted)).

The district court's estimate may be based upon physical evidence (such as seized drugs) or testimonial evidence. *United States v. Pruitt*, 156 F.3d 638, 647 (6th Cir. 1998). "[T]estimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable." *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir.

2004). We "afford the district court's credibility determinations regarding witness testimony great deference." *United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007). Clear error will not be found where two permissible views of the evidence exist, *Anderson v. City of Bessemer*, 470 U.S. 564, 573-74 (1985), and a district court's approximation of drug quantity is not clearly erroneous if it is supported by competent evidence in the record, *United States v. Brannon*, 7 F.3d 516, 520 (6th Cir. 1993).

### 1.      *Docherty: Responsibility for 100,000 Ecstacy pills*

At Docherty's resentencing, the district court found that she was responsible for at least 100,000 pills. Docherty challenges this finding on the ground that various witnesses said that they had purchased only relatively small quantities of pills from her. She also relies on an affidavit submitted by Jeross prior to Docherty's resentencing in which he estimates that he had provided Docherty with less than 4,000 pills and states that Docherty was "largely unaware" of the pill shipments coming from Canada.

The district court based its drug-quantity determination primarily on testimony from Leto, who was hired by Jeross to transport the Ecstacy pills from Canada to the United States. Leto testified at length and in detail at Docherty's initial sentencing hearing about the conspiracy, specifically addressing Docherty's role and the quantity of drugs involved. He stated that he brought "[a]pproximately ten thousand pills per trip" to the United States from Canada hidden in his car-door panels, and estimated that "one hundred thousand pills is less than the amount that was actually brought over while [his] involvement was going on."

Leto further testified that, upon returning to the United States from Canada with the pills, "[e]very time, the location I brought [the pills] back to was 1695 West Troy Street," which was Docherty's home. The pills would then be "unloaded out of the vehicle and brought into [Docherty's] house where they were split into packages of one hundred." Leto said that he witnessed the pills being repackaged in Docherty's house. He explained that "[t]he pills would come from Canada to Kathleen's house. Kathleen would handle the distribution between the four or five smaller distributors . . . ," and she would "regulate" the drugs that the distributors received.

Leto's testimony regarding the quantity of drugs was corroborated by Brian Manns, a special agent with the Department of Homeland Security's Immigration and Customs Enforcement who was involved in the investigation. Manns testified that "the amounts of money that were seized on [sic] this investigation correlate with over 100,000 pills" based on their estimated purchase and sale prices. Furthermore, Docherty's own written records of the drug transactions permitted Manns to "easily say that [Docherty and Jeross] sold over 100,000 pills." He also said that the investigation showed that Leto was not the only courier operating in the conspiracy, which suggests that more than the 100,000 pills transported by Leto were involved. In addition, Manns said that he had inspected Leto's car and concluded that the hidden car panels "were capable of holding well over 10,000 pills per trip." Leto, Manns said, had made between 10 and 15 trips to Canada.

The foregoing evidence supports the district court's finding that Docherty was responsible for at least 100,000 pills. Indeed, the testimony from both Leto and Manns suggests that the conspiracy involved well *over* 100,000 pills. By sentencing Docherty on the basis of 100,000 pills and not more, the district court appropriately exercised caution to ensure that Docherty was "more likely actually responsible for a quantity greater than or equal to the amount used in calculating the sentence." *See United States v. Mahaffey*, 53 F.3d 128, 132 (6th Cir. 1995).

Docherty's reliance on Jeross's affidavit, which states that Docherty was involved in distributing a much smaller quantity of pills, and testimony from witnesses who said that they had purchased only small quantities of drugs from her, does not warrant a different conclusion. First of all, the district court explained that it credited Leto's testimony over Jeross's affidavit because it

found "Leto to be a more truthful and credible individual than Jeross." The court's credibility determination is supported by Leto's detailed testimony, which was consistent with the contents of Docherty's notes, the assets seized, and other evidence uncovered in the course of the investigation. And Jeross's statement that Docherty was "largely unaware" of the shipments from Canada is contradicted by the evidence that the shipments were taken to her home, where she would handle the distribution of the pills once they were repackaged.

Furthermore, statements by other individuals regarding their purchase of small quantities of drugs from Docherty neither contradict Leto's testimony that at least 100,000 pills were involved nor undermine the district court's conclusion to that effect. These statements simply suggest that, in addition to her large-scale distribution activities, Docherty also sold small quantities of pills to other individuals.

The foregoing evidence supports the district court's finding that Docherty was responsible for at least 100,000 pills. We therefore conclude that the court did not err in making that determination.

### 2. Docherty and Jeross: Challenge to the use of the 2002 version of the Guidelines for calculating drug weights

Both Docherty and Jeross argue that the district court erred in failing to apply the 2001 Guidelines when determining the weight of the pills attributed to them for purposes of calculating their base offense levels. The 2001 Guidelines specified a typical weight for MDA of 0.100 gram per tablet, whereas all subsequent versions of the Guidelines provided for a typical weight per tablet of 0.250 grams for both MDA and MDMA. USSG § 2D1.1, cmt. n.11, Table: *Typical Weight Per Unit Table*.

Docherty's and Jeross's base offense levels were determined by establishing the total weight of the pills that contained the controlled substances. *See* USSG § 2D1.1(c). In cases such as the ones before us, however, the actual total weight of the pills is not known. The general rule in those cases to "multiply the number of doses, pills, or capsules by the typical weight per dose in the [Guidelines typical-weight table] to estimate the total weight of the controlled substance . . . ." USSG § 2D1.1, cmt. n.11, Table: *Typical Weight Per Unit (Dose, Pill, or Capsule) Table*. Note 11 states, however, that the estimates set forth in the Typical Weight Per Unit Table are *not* to be used "if any more reliable estimate of the total weight is available from case-specific information." *Id.*; *see also United States v. Nersesian*, 210 F. App'x 495 (6th Cir. 2006) (affirming the district court's determination of the total drug weight, which was based on the average per-pill weight of 10,000 Ecstacy pills actually recovered and tested—instead of the typical-weight measurements contained in the Guidelines—because "the district court properly relied on this 'case-specific information' to conclude that it was more likely than not that the Ecstacy pills tested were representative of the 100,000 pills the defendant admitted to trading" (quoting USSG § 2D1.1, cmt. n.11)); *United States v. Roche*, 415 F.3d 614, 619 (7th Cir. 2005) (rejecting the defendant's argument that the typical-weight measurement from the 2000 Guidelines should apply, instead concluding that the district court, in compliance with Note 11 to USSG § 2D1.1, properly estimated the drug weight based on the actual weight of the Ecstacy tablets recovered from the defendant and a coconspirator).

The district court is generally instructed to apply the version of the Guidelines that is in effect on the date that the defendant is sentenced. USSG § 1B1.11(a). But where the application of the version of the Guidelines in place at the time of sentencing would constitute a violation of the Ex Post Facto Clause of the U.S. Constitution, the court must apply the version of the Guidelines that was in place at the time the defendant committed the offense. USSG § 1B1.11(a), (b)(1), cmt. n.6.

Docherty was originally sentenced on October 23, 2003, when the 2002 Guidelines were in effect. Jeross was first sentenced on July 8, 2004, when the 2003 Guidelines were in effect. According to the indictment against them, the drug conspiracy ended on August 9, 2002, at which time the 2001 Guidelines were in effect. The 2002 and 2003 Guidelines would therefore apply to Docherty and Jeross, respectively, unless the 2001 Guidelines would result in a lower Guidelines range. *See* USSG § 1B1.11(a), (b)(1). The merits of each defendant's argument on this issue are addressed in turn below.

### a.　　Docherty

In preparation for Docherty's resentencing, the parties submitted, at the district court's request, a joint brief reporting the results of laboratory tests that were conducted on the 2,499 pills that Docherty sold to undercover law enforcement officers. The report includes the number of pills tested, the average weight per pill, and the weight of the controlled substance detected in each pill.

Docherty's argument challenging her base offense level rests on the assumption that the application of the typical weight per unit of MDA and MDMA (either 0.250 grams from the 2002 Guidelines or 0.100 grams from the 2001 Guidelines) affected her base offense level calculation. It did not. At her resentencing, the district court aptly noted that it did not need to determine which Guidelines version to apply because, instead of using the Guidelines' typical-weight estimates, it used data from the lab report, which it found to be more reliable. (Citing USSG § 2D1.1, cmt. n.11))

In Docherty's case, as in *Nersesian*, 210 F. App'x 495, case-specific information was available for determining the weight of the 100,000 pills attributed to her. The pills purchased from her by the undercover agents were tested and weighed in a lab, and the results were set forth with specificity in the lab report as well as in the parties' joint brief. This data was comprised of exact measurements and, like the information used in *Neresian*, was considered by the district court to be "more reliable" than the estimates contained in the Guidelines.

Note 11 to USSG § 2D1.1 does not, as Docherty suggests, instruct the courts to follow whichever approach leads to the more favorable result for the defendant. To the contrary, it explicitly states that where more reliable, case-specific information is available, such information is to be used. Accordingly, the district court properly used the lab data instead of relying on the Guidelines' typical-weight estimates. The version of the Guidelines that the district court used therefore had no effect on Docherty's base offense level calculations.

### b.　　Jeross

Jeross raises the same drug-weight argument that Docherty asserted. But in his case, unlike Docherty's, the district court used the typical-weight estimates from the Guidelines rather than actual lab results. The court erroneously thought that, whether it applied the typical-weight estimates from the 2001 Guidelines or the 2002 Guidelines, Jeross's base offense level would be 36. Having found him responsible for 100,000 pills, the court calculated his base offense level by multiplying 100,000 pills by 0.250 grams (the typical weight per unit of MDA and MDMA under the 2002 Guidelines), for a total of 25,000 grams of MDA/MDMA. It concluded that this drug weight corresponded to a base offense level of 36. Six levels were then added because of Jeross's role in the offense and his obstruction of justice (neither of which he challenges on appeal) for a total offense level of 42 and a Guidelines range of 360 months to life in prison. That range exceeds the 240-month statutory maximum for his drug offenses, however, so the court imposed a sentence of 240 months.

But the district court failed to do the last step in the calculation, which is to convert the MDA/MDMA drug weight (i.e., 25,000 grams) into its marijuana equivalent. *See* USSG § 2D1.1, cmt. n.10. That step was necessary because the Drug Quantity Table in USSG § 2D1.1(c) does not

list either MDA or MDMA, meaning that an equivalent weight of a listed drug has to be identified in order to obtain a base offense level. *See* USSG § 2D1.1, cmt. n.10. After multiplying 100,000 pills by the typical weight per pill, the court should have next multiplied the resulting MDA/MDMA drug weight by the marijuana-equivalency factor, which is 500 grams under either the 2001 or 2002 Guidelines. USSG § 2D1.1, *Drug Equivalency Tables, Table: LSD, PCP, and Other Schedule I and II Hallucinogens (and their immediate precursors).* The district court realized its mistake when it resentenced Docherty nine months after it resentenced Jeross. It also noted that it had not examined available laboratory data regarding the pills seized in Jeross's case, apparently because it thought that using either the 2001 or the 2002 Guidelines would have made no difference in Jeross's base offense level.

The record on appeal contains several references to pills that were recovered in the Jeross investigation and to a chemical analysis that was conducted on those pills. But no lab report for Jeross is included and the number of pills recovered in the investigation is inconsistently reported. Whether the pills referenced in connection with Jeross are the same pills that were purchased from Docherty is also unclear. Nevertheless, the record establishes that pills were obtained and tested in the Jeross investigation, which means that more reliable, case-specific information than the Guidelines' typical-weight estimates was likely available to the district court for the purpose of determining the weight of the pills. The record contains no indications that Jeross challenged the lab results at any time.

Two approaches were therefore available to the district court in calculating the weight of the drugs attributed to Jeross and the corresponding base offense level. First, the district court should have used the data in the lab report if that data was more reliable than the Guidelines' typical-weight estimates. *See* USSG § 2D1.1, cmt. n. 11. Alternatively, if the court had determined that such data was *not* more reliable, it should have instead used the typical-weight estimates set forth in either the 2001 or 2002 Guidelines, depending on which version led to a more favorable result for Jeross. *Id.*

The question before us is whether the district court's sentencing errors render Jeross's sentence procedurally unreasonable and thus warrant a remand for resentencing, or whether the errors were harmless. As the following discussion explains, the end result under either method of calculating the proper drug weight would have been the same: a Guidelines range that was well above the 240-month statutory maximum prison term that was permitted, and actually imposed, for Jeross's drug offenses. The district court, under either of the two approaches, would have been required to depart downward from the Guidelines range and render a sentence within the statutory maximum, which it in fact did at both of Jeross's sentencing proceedings.

The first possible approach would have been for the court to use the actual drug weights obtained from testing the pills attributed to Jeross, provided that such information was reliable. *See* USSG § 2D1.1, cmt. n.11. On this point, the government's brief refers to the information contained in the lab report and in the joint brief submitted in *Docherty's* case, but is unaccompanied by any explanation as to why that information should be used in calculating *Jeross's* base offense level. Jeross's brief is similarly unhelpful, stating only that the average weight of the seized pills containing MDA and/or MDMA was "less than 0.250 grams," without providing a specific weight and without identifying the source of that information. And Jeross's reply brief does not challenge the government's suggestion that the Docherty lab results are applicable in his case.

If the pills attributed to Jeross are either the same pills recovered from Docherty or have similar characteristics, then Jeross would most likely have been subject to a base offense level of 36. When combined with Jeross's criminal history category of I, this results in a sentencing range of 360 months to life (with the sentencing enhancements for his role in the offense and obstruction of justice) and is the very same base offense level that the district court arrived at both initially and at resentencing post-*Booker.* Jeross's base offense level would have had to be reduced to at least

32 (before adding six levels of enhancements) to result in a Guidelines range that was within the 240-month statutory maximum for his offense (i.e., 235-293 months). But our discussion in Part II.B.3. below explains why a base offense level of 32 or lower would have been inappropriate in Jeross's case.

If, however, lab results for the pills attributed to Jeross were neither available nor reliable, then either the 2001 or 2002 Guidelines' typical-weight estimates for determining Jeross's sentence were possible alternatives. Under the 2002 Guidelines, which were in fact used at Jeross's resentencing, the typical weight of both MDA and MDMA is listed as 0.250 grams and would have resulted in a marijuana equivalent of 12,500 kilograms (i.e., 100,000 pills x 0.250 grams of MDA or MDMA x 500 grams of marijuana), which corresponds to a base offense level of 36. That is the same base offense level that the district court calculated at both of Jeross's sentencing proceedings and, after adding six levels for the applicable enhancements, would result in the very same Guidelines range of 360 months to life in prison.

Finally, the district court could have applied the typical-weight estimates from the 2001 Guidelines, and should have done so if the 2001 Guidelines led to a more favorable result. This is Jeross's argument. Specifically, he contends that the proper course would have been for the district court to apply the 2001 Guidelines' typical MDA weight of 0.100 grams to all 100,000 pills, claiming that of the 2,128 pills purportedly obtained during the investigation against him, 1,650 contained MDA, 478 contained MDMA, and 976 contained no controlled substance (data that is unsupported by either citations to the record or any further explanation of its source). Application of the 2001 Guidelines, however, would be problematic in this case.

The 2001 version lists the typical weight for MDA as 0.100 grams, but does not provide a typical weight for MDMA, and therefore does not make clear how to calculate the weight of pills containing MDMA where actual information is unavailable. Adding to the problem is a note to the Typical Weight Per Unit Table in the 2001 Guidelines explaining that the weight of 0.100 grams listed for MDA is in fact the typical weight of the actual controlled substance, or pure MDA, and not the typical weight of the pill containing the MDA. USSG § 2D1.1, Table: *Typical Weight Per Unit*, cmt. 11 n.* (2001). The same note further explains: "Therefore, use of this table provides a very conservative estimate of the total weight." *Id.* As previously noted, all versions of the Guidelines expressly state that a defendant is to be held responsible for the weight of the entire pill, not just the weight of the controlled substance. USSG § 2D1.1 n.A.

This case, however, does not require us to decide what a district court should do when it must determine the weight of pills that contain MDMA using the typical-weight estimates from the 2001 Guidelines, which do not provide an MDMA weight. That is because here, even if the district court had applied the MDA typical-weight estimate to all 100,000 pills, the result would have been a base offense level of 34 (i.e., 100,000 pills x 0.100 grams of MDA x 500 grams of marijuana, which totals 5,000 kilograms of marijuana). That base offense level, plus the six levels of sentencing enhancements, would result in a total offense level of 40 and a Guidelines range of 292-365 months in prison. Such a range, like the sentencing ranges obtained under the other scenarios, well exceeds the 240-month statutory maximum for Jeross's drug-related offenses. Thus the court would once again be required to downwardly depart from the Guidelines range and impose a sentence within the maximum term permitted by the statute, as it did in sentencing Jeross.

The foregoing analysis demonstrates that, even if the district court had correctly converted the MDA/MDMA drug weight into its marijuana equivalency, determined whether to use the actual weight information from the lab report, or used the 2001 Guidelines for determining a drug weight, the result would have been no different: a Guidelines range that was well above the 240-month statutory maximum. Based on our review of the record, we see no grounds for finding that these errors "affect[ed] the district court's selection of the sentence imposed." *See United States v.*

*Hazelwood*, 398 F.3d 792 (6th Cir. 2005) (quoting *Williams v. United States*, 503 U.S. 193, 203 (1992)).  Under all scenarios, in other words, the district court would have been required to impose a lesser sentence in order to comply with the statute, the Guidelines range notwithstanding.  Nothing in the record, moreover, suggests that the district court would have imposed a sentence of less than 240 months.  Accordingly, the district court's errors were harmless and do not warrant a remand for sentencing Jeross a third time.

### 3.  *Docherty and Jeross: Challenge to the method of calculating the weight of all 100,000 Ecstacy pills*

Docherty and Jeross both challenge the district court's determination of the weight of all 100,000 pills for which they were held responsible.  As discussed above, the district court may approximate the amount of drugs involved based on competent evidence, so long as a preponderance of the evidence supports the estimate.  Furthermore, this court has repeatedly held that a district court may extrapolate the total weight of all of the drugs attributed to a defendant from the actual weight of a smaller amount of drugs actually recovered.  *United States v. Nersesian*, 210 F. App'x 495, 498 (6th Cir. 2006) (affirming the district court's base-offense-level calculation, which applied the average per-pill tablet weight of the 4,999 pills tested by the government to all 100,000 pills that the defendant admitted to distributing, and explaining that "the district court's extrapolation of the total weight from the sample size is not clearly erroneous and we cannot say that the court erred in using this estimate to determine Nersesian's base offense level"); *United States v. Gonzalez*, 210 F.3d 373 (Table) (6th Cir. 2000) (holding that the district court did not err in determining the total quantity of marijuana and cocaine contained in 11 mail parcels based on the actual weight of marijuana and cocaine found in the only two mail parcels that were recovered); *United States v. Ventimiglia*, 4 F.3d 995 (Table) (6th Cir. 1993) (affirming a drug-quantity determination where the district court estimated the amount of drugs contained in two unrecovered packages of meth based on the actual weight of meth found in one intercepted package, and observing that "[n]umerous courts have upheld similar drug quantity calculations").

### a.  *Docherty*

Docherty argues that the district court was "unreasonable" in applying the weight measurements of the 2,499 pills that she sold to undercover agents to all 100,000 pills for which she was held responsible.  In addition, she argues that, under the rule of lenity, the district court should instead have "based any estimation of the unrecovered pills upon the estimate of the actual amount of MDA per tablet that is most favorable to Ms. Docherty," which she contends would have been 50 milligrams, or 0.05 grams, per pill.  This is an amount that is equal to the active-ingredient, or "pure," weight of MDA.  She essentially asserts a two-part argument, and we will address each part in turn.

In the first place, the district court determined Docherty's base offense level by relying on the drug-quantity calculations set forth in the parties' joint brief, which in turn relies on the data contained in the lab report.  All nine calculation methods used the same formula, which multiplied 100,000 (the total number of pills) by a specified drug weight per pill by the marijuana-equivalency factor, the total of which resulted in a corresponding base offense level under USSG § 2D1.1(c).

The calculations on which the district court relied in determining Docherty's base offense level are analogous to those approved by this court in the cases cited above.  Moreover, the calculations utilize data that was contained in the Drug Enforcement Agency lab report and stipulated to in the parties' joint brief.  Docherty has failed to provide any basis on which to conclude that the court erred in its calculation method.

The second part of Docherty's argument is that, applying the rule of lenity, the district court should instead have calculated her base offense level by using a drug weight that is most favorable

to her, which she identifies as 50 milligrams per pill. But, as explained in Part II.B.2. above, the Guidelines in effect at all times relevant to this case provide that a defendant's base offense level is to be determined by the *entire* weight of the pill containing the controlled substance, and not by the weight of the actual controlled substance alone (i.e., the weight of the pure MDA, MDMA, or meth contained in the pill). *See* USSG § 2D1.1, cmt. n.A ("[T]he weight of a controlled substance set forth in the [Drug Quantity Table] refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance.").

This court has repeatedly rejected the argument that only the "pure" weight of a controlled substance should be used as the basis for calculating a defendant's base offense level instead of the weight of the entire pill. *See, e.g., United States v. Jinadu*, 98 F.3d 239, 250 (6th Cir. 1996) (concluding that the defendant's argument that the pure weight, instead of the total weight, of the drug should be the standard "has no merit"); *United States v. Landers*, 39 F.3d 643, 647 (6th Cir. 1994) (noting that the Sixth Circuit has repeatedly held under USSG § 2D1.1 that "the entire weight of dilaudid tablets, rather than merely the quantity of hydromorphone contained therein, must be taken into account, and therefore the potency of the particular doses at issue was irrelevant for sentencing purposes as long as they contained *some* amount of active ingredient") (emphasis in original); *United States v. Williams*, 894 F.2d 208, 214-15 (6th Cir. 1990) (calculating the defendants's base offense level under the Guidelines on the basis of the total weight of cocaine involved in the transaction, even though the government chemist reported that only 87% was a pure form of cocaine). Accordingly, Docherty's argument fails.

To be sure, this court's decision in *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990), also discussed in Part II.B.2.b. above, instructs that a court must be cautious "when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity," thereby "protect[ing] defendants from being held responsible for drug quantities in excess of the amounts for which they more likely than not are responsible." But this rule does not, as Docherty argues, require a court to sentence a defendant using the most favorable drug weights available (i.e., active, or pure, ingredient weights instead of total-pill weights) when doing so would directly contradict the Guidelines. Indeed, such a rule would eviscerate the Guidelines' explicit instruction to hold a defendant responsible for the total weight of the pill in question and, moreover, would have required an entirely different result in each of the cases cited above.

The district court in the present case therefore properly rejected the four calculations in the joint brief that were based on active-ingredient weights. Those calculations resulted in base offense levels of 32, 34, 36, and 38. Furthermore, the calculations that resulted in the lower base offense levels of 32 and 34 relied not only on using just the active-ingredient weights of the drugs, but assumed that all 100,000 pills contained only MDA and MDMA and did not contain any detectable amounts of meth. Meth, however, was present in 1,479, or 59%, of the pills tested and has a drug equivalency conversion factor of 20 kilograms of marijuana to one gram of meth compared to a 500-gram marijuana-equivalency conversion factor for both MDA and MDMA. The presence of meth would thus result in a significantly higher total drug quantity and base offense level than the presence of only MDA and/or MDMA. In addition, the base offense level of 32—which Docherty urges is correct—also assumes that all 100,000 pills had the *lightest* active-ingredient weight, 50 milligrams, an amount that appeared in only 7 (or 0.28%) of the 2,499 pills recovered.

In contrast, the five calculations that used a total-pill weight (not an active-ingredient weight) resulted in base offense levels of 36 (in four calculations) and of 38 (in one calculation). Of these five calculations, one method used the average tablet weight of all pills recovered and one method used the typical weight estimate from the Guidelines. Both resulted in a base offense level of 36. Moreover, the record indicates that the district court did not consider the calculations that resulted in a base offense level of 38, suggesting that it in fact applied the rule of lenity, if only implicitly.

Having reviewed all of this information, the district court concluded that "[t]he lab results indicate that the quantity of drugs present supports a base offense level of 36." This conclusion is corroborated by competent evidence in the form of calculations that properly used the average total-pill weight from the lab report (and was consistent with results based on the Guidelines' typical-weight estimate). Accordingly, the district court did not err in calculating Docherty's base offense level at 36.

### b.    *Jeross*

Jeross argues that only 2,128 pills were recovered in his case, and asserts that "[t]he number of pills . . . was too small (and, of the pills seized, the weight too varied) from which extrapolation to a total weight should occur." But, as discussed in Part II.B.2.b. above, the district court did not in fact extrapolate the total weight of the 100,000 pills attributed to Jeross from the pills recovered. It instead determined the total weight by using the typical-weight estimate contained in the Guidelines. Jeross's argument on this issue is therefore without merit.

### 4.    *Jeross:* **Apprendi** *violation*

Jeross next argues that the district court failed to comply with the ruling in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), by imposing consecutive sentences that were greater than the statutory maximum permitted for his offenses. The district court sentenced Jeross to four *concurrent* prison terms of 240 months each—the maximum permitted by the statute—for his drug-related offenses. Jeross also received one *consecutive* term, as permitted by USSG § 5G1.2(d), of 30 months' imprisonment for a related offense of evading cash reporting requirements, a term that is well below the statutory maximum of 60 months for that offense. Such a sentence does not violate *Apprendi* because it does not exceed the statutory maximum for any of the offenses at issue.

## C.    Docherty: Sentencing enhancement for her role as manager

The district court increased Docherty's base offense level by three levels upon finding that she was a "manager during the commission of the instant offense that involved five or more participants." *See* USSG § 3B1.1(b). Docherty argues that the court erred in doing so because she was "somewhere in the middle of the drug distribution chain" and because the evidence does not support a finding that she managed other participants. She contends that she was "involved only in the distribution of very small scale distribution and personal use quantities of ecstacy to others," that she "did not direct or control when or how [the pills] were carried across the border as Mr. Jeross did," and that she "did not direct or control what happened to the pills after they left her immediate possession."

"A district court's determination regarding a defendant's role in the offense is reversible only if clearly erroneous." *United States v. Gates*, 461 F.3d 703, 709 (6th Cir. 2006). Factors that a court should consider in making this determination include

> the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

USSG § 3B1.1, app. n.3. "The standard applied to sentencing factors is preponderance of the evidence." *United States v. Garcia*, 19 F.3d 1123, 1125 (6th Cir. 1994).

Leto, the drug courier on whose testimony the district court relied, testified at length about Docherty's role in the conspiracy, as discussed in Part II.B.3. above. His testimony was based on

his own first-hand observations of the inner workings of the conspiracy, as well as information that he obtained when Docherty confided in him.

Leto testified that Docherty's role in the organization was to "handle the distribution between the four or five major smaller distributors." Specifically, he stated that Docherty's house was the repackaging and redistribution location when the Ecstacy pills arrived from Canada, and that she would distribute the repackaged pills to others. Leto further explained that "[t]hose four or five people would be taking a thousand or two thousand [pills] per week, Kathleen would usually regulate that. Joe [Jeross] tended to be a hands-off type of guy." When Leto worked as a distributor, he said that one of his jobs was to sell the pills he received from Docherty and give any profits to Docherty, who would in turn hand them over to Jeross.

Docherty, he said, "handl[ed] the transactions on behalf of Mr. Jeross," including drug transactions that occurred in Jeross's presence. According to Leto, Docherty also managed all of the money that was made from the eventual sale of the pills. Leto said that Jeross "was financing the whole program" and "[paid] Kathleen a salary of . . . [$]2,000 to $2,500 per week" to handle the drug distribution and cash transactions. He further testified that he saw Docherty writing in a notebook that was later found to contain drug-transaction records. The notebook showed that she would often "front" drugs to the distributors, including Leto, whose debt totaled $8,465 at the time that the notebook was seized. The numbers in the notebook also recorded debts that other people owed to Docherty. As noted in Part II.B.1. above, Leto's testimony is corroborated by Agent Manns's testimony, Manns's review of the notebook, and information obtained through interviews with other participants in the conspiracy.

Based on these facts, all but two of the Guidelines factors support the district court's determination of Docherty's role in the conspiracy. The record does not contain evidence that she recruited accomplices (this was apparently Jeross's job) or that she claimed a right to a larger share of the fruits of the crime, but it contains ample evidence relating to the other factors. Leto's testimony shows that Docherty handled the transactions with individual distributor-sellers. She received the drugs from Canada, permitted the pills to be repackaged for distribution in her home, doled out the repackaged pills to four or five distributors whom she "regulated," kept detailed transactional and financial records, collected the profits that the distributors returned to her, and, finally, passed the profits along to Jeross. Her role as a distributor may have placed her "in the middle of the drug distribution chain" as she asserts, but it was no less important for that reason, and does not preclude the finding that she was a manager who exercised decisionmaking authority.

Docherty's recordkeeping, which was consistent with both Leto's observations and with other evidence seized in the investigation, reveals that she kept track of the drug transactions. It also establishes that she regularly fronted drugs to the distributors, sometimes in exchange for future cash payments and sometimes for work around her house, thus supporting the conclusion that she had the authority to decide how to manage and value the inventory of pills. In Leto's case alone, she fronted him drugs that she valued at over $8,000. The scope of the illegal activity was also significant. As discussed in Part II.B.1. above, Docherty was responsible for at least 100,000 pills that came through her hands as part of a drug conspiracy that led to a seizure of approximately $450,000 in cash.

Docherty fails to cite anything in the record to refute her role as a manager. The amount of evidence against her, moreover, is much greater than that which was present in the cases she cites for support. *See United States v. Walker*, 160 F.3d 1078, 1091-92 (6th Cir. 1998) (holding that the district court's USSG § 3B1.1(c) finding was clearly erroneous where not a single witness discussed any organizational, administrative, or decisionmaking role for the defendant in the drug operation); *United States v. Burgos*, 324 F.3d 88, 92-93 (2d Cir. 2003) (holding, under a de novo standard of review, that the defendant was not a manager because he did not exercise control over anyone else; rather, the extent of his involvement was that he offered his services as a stolen-check broker to a

coconspirator and demanded that another coconspirator make an advance payment on a set of checks); *United States v. Jones*, 160 F.3d 473, 482-83 (8th Cir. 1998) (holding that the district court's finding under USSG § 3B1.1 was clearly erroneous where evidence showed that the defendant "merely sold drugs for resale," and where none of the USSG § 3B1.1 factors were present); *United States v. Graham*, 162 F.3d 1180, 1183 (D.C. Cir. 1998) (holding that the defendant was not a manager under USSG § 3B1.1(b) where a coconspirator's vague, nonspecific testimony showed only that the defendant "was sometimes a lieutenant," and that the defendant referred potential drug buyers to fellow conspirators who actually sold the drugs). In light of the foregoing, we conclude that the district court did not err in finding that Docherty was a manager for the purpose of enhancing her sentence.

**D.      Jeross: Obstructionist conduct and acceptance of responsibility**

Jeross challenges the district court's failure to apply a three-level reduction to his base offense for acceptance of responsibility under USSG § 3E1.1. Although Jeross acknowledges that the court rejected his request because he was found to have obstructed justice, he argues that the facts of his case warrant an exception to the general rule that a defendant who has obstructed justice is ineligible for an acceptance-of-responsibility reduction. Jeross relies on Note 4 to USSG § 3E1.1, which provides that conduct resulting in an obstruction-of-justice enhancement "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both § 3C1.1 and [§] 3E1.1 may apply."

The threatening behavior at issue included Jeross telling a probation officer during a presentence interview that he hoped to be placed in the same incarceration facility as Leto so that Jeross could make Leto his "bitch." In addition, the court found that Jeross directly threatened Leo on two occasions, once by making a "cut-throat" gesture towards Leto and later by approaching Leto in a threatening way when the two men encountered each other in downtown Detroit. Leto, who provided extensive testimony regarding Jeross's role in the offense and the drug quantities involved in the conspiracy, said that he feared for his life as a result of Jeross's threats.

Jeross concedes that he engaged in the above-described threatening conduct toward Leto, and that Leto "felt apprehensive" based on Jeross's actions. He contends, however, that he pled guilty *after* the threats occurred. But Jeross does not cite to any evidence in the record that supports his version of the timeline of events.

A district court's determination that a defendant's case is "extraordinary" under Note 4 to USSG § 3E1.1 is a question of law that we review de novo. *United States v. Gregory*, 315 F.3d 637, 640-41 (6th Cir. 2003) (finding that extraordinary circumstances existed because all of the defendant's obstructive conduct predated his indictment, he never denied his own responsibility and guilt, and he cooperated with officials long before he was ever charged with an offense). "Sixth Circuit law interpreting this provision has consistently granted district courts great leeway when making this determination." *Id*. at 640 (citation omitted).

Appropriate considerations for determining whether a reduction is warranted for acceptance of responsibility include the defendant's truthful admission of the charged offense, the defendant's voluntary assistance to authorities in resolving the offense, and the timeliness of the defendant's conduct in affirmatively accepting responsibility for his actions. *Id*. The defendant has the burden of proving the extraordinary nature of his or her case where obstruction of justice has occurred. *United States v. Angel*, 355 F.3d 462, 477 (6th Cir. 2004) (finding that a sentence reduction under USSG § 3E1.1 was inappropriate where the defendant obstructed justice after he was indicted by refusing to admit to the district court that he had offered someone $50,000 to kill the government witness).

Jeross asserts that the facts of his case satisfy the *Gregory* standard because his obstructive conduct occurred at his arraignment, before he pled guilty, and because he cooperated with the government by attending debriefings. A number of significant distinctions, however, are apparent from a comparison of Jeross's case to the facts of *Gregory*. Unlike the defendant in *Gregory*, all of Jeross's obstructive conduct occurred at or after his indictment and, according to the bond-revocation transcript, two of the incidents occurred after his guilty plea. Jeross fails to cite any evidence in the record that supports his assertion that his obstructive conduct occurred only before he pled guilty.

He also denied his guilt for over four months after his indictment and challenged both his role in the offense and the amount of drugs involved until the date of his original sentencing hearing in July of 2004. Moreover, Jeross did not begin cooperating with the government until May of 2004, shortly after the total offense level recommended in his PSR was revised upward as a result of his threatening conduct. In exchange for his assistance, Jeross received a sentence of only 30 months for the offense of structuring transactions to evade cash-reporting requirements, a term that is well below the statutory maximum of 60 months.

Jeross on these facts has failed to meet the "exacting standard" under *Gregory* of showing that he is entitled to an acceptance-of-responsibility reduction after having obstructed justice. The district court therefore did not err in determining that he was ineligible for such a reduction.

**E.     Jeross: Discussion of § 3553(a) factors**

Jeross next challenges the procedural reasonableness of his sentence on the ground that neither the district court's remarks at his resentencing hearing nor its written opinion "suffced to address the factors set forth in [18 U.S.C. §] 3553(a)." The district judge, according to Jeross, "tersely reiterated his originally-imposed sentence, and stated that it would be reimposed. This case should be remanded for resentencing with a full explanation of the reasons for the specific sentence imposed."

District courts may exercise discretion in determining how much of an explanation of the sentence is required because "the amount of reasoning required varies according to context." *United States v. Liou*, 491 F.3d 334, 338 (6th Cir. 2007). A district court "need not recite [the] § 3553(a) factors," *United States v. Richardson*, 437 F.3d 550, 554 (6th Cir. 2006), nor engage in "the ritual incantation of the factors" in order for the appellate court to affirm a sentence, *United States v. Johnson*, 403 F.3d 813, 816 (6th Cir. 2005). The sentencing judge must, however, at least "set forth enough [explanation] to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007).

In the present cases, our dissenting colleague criticizes what he sees as the "ratcheting up" of the defendants' sentences based on factual findings by the district court that the dissent believes "create a sentence many years above the indictment-charged facts to which the two defendants pled guilty," relying primarily on the Supreme Court's decision in *Cunningham v. California*, 127 S. Ct. 856 (2007). (Dissenting op. at 20) We believe that such reliance is misplaced. *Cunningham* addressed the question of whether, under California's sentencing scheme, a defendant may be sentenced to a term of imprisonment above the statutory maximum based on a fact not found by a jury or admitted by the defendant, but rather on the basis of facts that are found by a judge and established by a preponderance of the evidence. *Id.* at 860. The Court answered in the negative, reaffirming its holding in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Cunningham*, 127 S. Ct. at 864 (quoting *Apprendi*, 530 U.S. at 490).

Docherty's and Jeross's cases, however, do not present such a problem. The two defendants in this case exposed themselves to sentences of up to 240 months in prison (i.e., 20 years) based solely on their guilty pleas for the drug offenses, apart from any additional factfinding by the district court. Jeross also pled guilty to structuring monetary transactions to avoid reporting requirements, and in doing so faced up to an additional 60 months in prison. Both received terms of imprisonment that were either at or below the statutory maximum for the offenses to which they pled guilty. Docherty received a total of 188 months' imprisonment for her offenses. Jeross received 240 months' imprisonment for his drug offenses, plus a consecutive sentence of 30 months for his nondrug offense (well below the 60-month statutory maximum), thus resulting in a total prison term of 270 months (i.e., 22.5 years). Their sentences therefore did not violate the rulings in either *Apprendi* or *Cunningham*.

The dissent also takes issue with the district court's application of the Guidelines, arguing that the sentencing judge "should not go up or down from the base offense level unless in his or her own mind the weighing process leads to a different sentence . . . ." (Dissenting op. at 22) A sentencing judge, according to the dissent, should not adjust a defendant's sentence based on "guidelinism, . . . but rather because the judge's own sense of justice, upon reflection, leads to a different result than the beginning, base-offense level." *Id.*

We think that such an approach—with each judge following not the Guidelines, but his or her "own sense of justice"—is of little practical help, however, to a district court that is presented with defendants whose guilty pleas subject them to sentences of anywhere between zero and 20 years in prison. Indeed, one of the primary objectives of the Guidelines was to achieve "uniformity in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct by similar offenders." USSG § 1A1.1, *Introduction and General Application Principles: Part A Introduction—The Basic Approach (Policy Statement)* (2007). The dissent's proposed approach was in fact considered, but rejected, by the Sentencing Commission, which explained that

> it is tempting to retreat to the simple, broad-category approach [to sentencing] and to grant judges the discretion to select the proper point along a broad sentencing range. Obviously, however, granting such broad discretion risks correspondingly broad disparity in sentencing, for different courts may exercise their discretionary powers in different ways. That is to say, such an approach returns to the wide disparity that Congress established the Commission to limit.

*Id.*; *see also* 18 U.S.C. § 3553(a)(6) (providing that one of the factors that a court should consider in imposing a sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). Nevertheless, the Guidelines are now advisory and, although § 3553(a) "still requires a court to give respectful consideration to the Guidelines," the district court is permitted to exercise its discretion to "tailor the sentence in light of other statutory concerns as well." *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007).

In Jeross's case, the district court explicitly acknowledged at both the resentencing hearing and in its written opinion that the Guidelines are advisory and that it was required to consider the § 3553(a) factors in imposing Jeross's sentence. The court then proceeded to explain its consideration of those factors before concluding that the 270-month sentence was appropriate. Specifically, the court noted the seriousness of Jeross's conduct, his threats toward Leto, his personal characteristics, the need to protect the public, and the interest in promoting deterrence and respect for the law. This discussion provided a sufficient explanation of the sentence imposed and shows that the district court had a reasoned basis for exercising its sentencing authority.

And although Docherty does not raise the same § 3553(a) challenge, we note, in response to the dissenting opinion, that the same is true of the district court's consideration of her sentence. The district court explained that although "her education, family ties, and lack of prior criminal conduct are in her favor, her situation also means that unlike many Defendants who come before me, she did not turn to selling drugs out of desperation." It also observed that her conduct was "quite serious," in part because "while raising a young child in her home, she conspired to sell large quantities of drugs out of that home, a decision which has large impacts for society and her child." Given her personal characteristics, the district court then sentenced her at the low end of the applicable Guidelines range. In light of the foregoing, we see no indication that the district court abused its discretion in sentencing either Docherty or Jeross, nor, for that matter, anything that suggests that the sentences violated the court's "own sense of justice."

## F.       Docherty and Jeross: Allocution at resentencing

Both Docherty and Jeross further challenge their resentencings on the ground that the district court did not give them the opportunity to personally address the court pursuant to Rule 32(i)(4)(A)(ii) of the Federal Rules of Criminal Procedure. That rule requires the court, before imposing a sentence, to "address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence." *Id.*

When a defendant is given an opportunity to object to a sentence in the district court and "does not clearly articulate any objection and the grounds upon which the objection is based," we review the objections raised on appeal under the plain-error standard. *United States v. Bostic*, 371 F.3d 865, 872-73 (6th Cir. 2004). Plain-error review requires us to determine whether (1) there was an error, (2) the error was "obvious or clear," (3) the error affected the defendant's substantial rights, and (4) "this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006).

In *United States v. Riascos-Suarez*, 73 F.3d 616, 627 (6th Cir. 1996), this court held that the district court had erred in failing to allow the defendant to exercise his right of allocution at his sentencing and remanded the case for resentencing. We had previously held, however, that Rule 32 requires allocution only before a court imposes the *original* sentence on a defendant, and does not require allocution at *resentencing*. *United States v. Coffey*, 871 F.2d 39, 40-41 (6th Cir. 1989) (holding that allocution was not required in resentencing following revocation of the defendant's probation, and adopting the approach set forth in *United States v. Core*, 532 F.2d 40, 42 (7th Cir. 1976), where the Seventh Circuit concluded that "[w]e interpret the rule to mean that allocution is required only before imposing the original sentence"); *see also Pasquarille v. United States*, 130 F.3d 1220, 1223 (6th Cir. 1997) (holding that "[t]he defendant's right to speak . . . applies to the original sentence and not to the subsequent resentencing").

According to the foregoing Sixth Circuit precedent, which neither defendant acknowledges, the district court was not required to allow them to allocute at resentencing. The court therefore did not err in failing to give them the opportunity to do so. *See Coffey*, 871 F.2d at 40. Nevertheless, we recognize the "sound practice for a district court to permit a defendant to speak regardless of the timing of the sentence." *Id.* at 41.

Docherty and Jeross do not dispute the fact that the court gave them the opportunity to speak before their original sentences were imposed. Jeross affirmatively told the judge that he had nothing to say, and Docherty actually addressed the court at length. Neither Docherty nor Jeross submitted any new evidence or raised new arguments at their resentencings. These facts significantly undermine their argument on appeal. *See Pasquarille*, 130 F.3d at 1223 (noting that the defendant had the opportunity to address the court at his original sentencing, had not submitted any new, mitigating evidence at resentencing, and did not dispute the facts of record).

The district court in the present case resentenced Jeross and Docherty on the same record that was before it at their initial sentencings. Their resentencings each followed a limited remand, the sole purpose of which was to "allow[] the court to determine if it would have granted a different sentence, had it known at the time of the [initial] sentencing that the Sentencing Guidelines were advisory, not mandatory." *See United States v. Haynes*, 468 F.3d 422, 425 (6th Cir. 2006). No new evidence was submitted, the defendants' PSRs were not revised, and neither defendant raised any new arguments at resentencing. Furthermore, Docherty and Jeross were subject to, and each received, the very same sentence, whereas the defendant in *Coffey* received a significantly longer term of imprisonment at resentencing. The defendants in this case also fail to provide any basis for concluding that their substantial rights were affected or that the integrity of the proceedings was impaired. They raise only the wholly speculative possibility that the court might have sentenced them differently if the defendants had personally addressed the court.

As previously mentioned, the better practice is for a district court to permit allocution at any sentencing proceeding, regardless of the timing, and the district court below would have been well advised to do so in this case. Jeross and Docherty nevertheless had no right to allocution at their resentencing, so the district court's failure to allow for allocution does not constitute a reversible error.

## G.    Jeross: Presentence Report

Jeross also argues that the district court erred in failing to inquire about whether he and his counsel had read and discussed the PSR. He did not, however, raise an objection regarding this issue at his resentencing. Because Jeross failed to object before the district court, we review the alleged error under the plain-error standard. *See United States v. Lalonde*, 509 F.3d 750, 757 (6th Cir. 2007) (citing *United States v. Vonn*, 535 U.S. 55, 66 (2002) ("A defendant's right to review of error he let pass in silence depends upon the plain error rule.")).

A procedural challenge to a sentence for failure to inquire about a defendant's review of his PSR arises under Rule 32(i)(1)(A) of the Federal Rules of Criminal Procedure. That rule provides that "[a]t sentencing, the court . . . must verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the report." Although we require literal compliance with Rule 32(i)(1)(A), *United States v. Mitchell*, 243 F.3d 953, 955 (6th Cir. 2001), "[a] trial judge need not expressly ask the defendant if he and his counsel have read and discussed the report." *United States v. Osborne*, 291 F.3d 908, 910 (6th Cir. 2002). "[I]nstead, the court need only *somehow* determine that defendant and counsel have had an opportunity to read and discuss the [PSR]." *Id.* (emphasis and second alteration in original) (quoting *United States v. Stevens*, 851 F.2d 140, 143 (6th Cir. 1988)).

The district court at Jeross's resentencing hearing did not specifically inquire of Jeross whether he and his attorney had reviewed and discussed the PSR, but the court was not required to so inquire if it could "somehow determine" that Jeross and his counsel had had the opportunity to review and discuss it. *See Osborne*, 291 F.3d at 910. A review of the transcript from Jeross's sentencing and resentencing hearings reveals that the district court had ample grounds on which to determine that Jeross and his counsel had had the opportunity to review and discuss his PSR, which was not revised after Jeross was initially sentenced.

Prior to Jeross's initial sentencing, the government prepared a sentencing memorandum that cited to, and extensively discussed, the information contained in the PSR. The parties then discussed at Jeross's initial sentencing hearing a downward departure that was set forth in the PSR. Jeross's lawyer also told the court that he had "discussed with Mr. Jeross" certain objections to Jeross's role in the enterprise and the quantity of drugs involved—information that was contained in the PSR—and that Jeross had decided to withdraw those objections. Defense counsel also explained

that "Mr. Jeross understands the sentence that the Court is about to impose, and . . . has cooperated with the government to provide information for the sentence of 270 months."

Following remand, Jeross raised the same challenges in two resentencing memoranda and two replies to the government's resentencing memorandum, each of which included explicit references to the PSR. One of Jeross's resentencing memoranda, for example, summarizes the method by which "the probation department calculated the sentencing guidelines" and cites to page eight of the PSR in challenging the weight of the pills attributed to Jeross.

At the resentencing hearing itself, Jeross's counsel raised these same, and other, challenges that took issue with information contained in the PSR. The government attorney, moreover, specifically reminded the district court at resentencing that "Jeross has previously withdrawn and waived all objections to the presentence investigation report in this matter." Jeross's counsel then confirmed that fact to the court. On the basis of this record, the district court had ample grounds on which to determine that Jeross and his counsel had had the opportunity to review and discuss the PSR. Accordingly, the court did not err in failing to specifically inquire of Jeross whether he had discussed and reviewed it with his counsel.

**H.     Jeross: Reassignment to a different judge upon remand**

Because we are affirming Jeross's sentence, we have no need to reach his request to remand the case to a different district judge for resentencing.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the sentences of both Jeross and Docherty.

---

**DISSENT**

---

MERRITT, Circuit Judge, dissenting. This is another drug case in which our system of criminal law has imprisoned for many years two more lives and torn up two more families by grossly excessive sentences imposed in the "War on Drugs." There are many reasons that our federal system of punishment has turned in this direction, not the least of which is the advent during the last 20 years of our irrational set of sentencing guidelines that judges apply by rote on a daily basis. We are constantly adding new prisoners like these defendants with long periods of incarceration to the more than two million men and women now incarcerated in the hundreds of prisons and jails around the country.

These sentencing guidelines hold that mitigating factors like family ties, mental illness, education, and the likelihood of rehabilitation are simply "not relevant" in the sentencing process. Judges' minds are closed down and sentences ratcheted up by applying convoluted conversion formulas like the one just recited in the majority opinion. The recent *Blakely-Booker-Cunningham* line of Supreme Court cases has given judges an opportunity to rid the system of some of the worst aspects of guidelinism, but we judges soldier on by applying the old mandatory system as though nothing of significance had happened. The cost to the taxpayers and in human lives has become enormous and shows no signs of change.

The majority ratchets the sentence up and up in this case by upholding the factual findings of the district judge that create a sentence many years above the indictment-charged facts to which the two defendants pled guilty. Neither the indictment nor the plea include any quantity of drugs. The base line sentence for the facts of the guilty plea is Level 16, yielding a sentence of 21-27 months for these two defendants who have never previously been convicted of any offense.

After ratcheting up the sentence based upon multiple, disputed judge-found facts regarding quantity, the majority then upholds further judicial fact findings of various disputed enhancements, including a large enhancement for managing the distribution of some ecstasy pills. The majority upholds these grossly inflated sentences by stating simply that these are "factual findings that we review under the clearly erroneous standard," citing a group of pre-*Booker* and pre-*Cunningham* cases as though *Booker* and *Cunningham* had never been decided. As a result of all of these fact findings, the young male defendant received 22-1/2 years imprisonment and the young female 15-1/2 years. Neither the district court nor the majority seriously discusses or takes into account any mitigating factors — such as the fact that the woman has a small child to raise and take care of, or the likelihood of rehabilitation, or the fact that we are dealing here with first offenders with clean records. No real consideration was given by the majority or the district court to the § 3553 factors or to any factors other than the old mandatory guideline rules. Neither court mentions or gives any consideration to the "overarching provision [of § 3553] instructing district courts to 'impose a sentence not greater than necessary' to accomplish the goal of sentencing." *Kimbrough v. United States*, 2007 U.S. LEXIS 13082 AT *30 (December 10, 2007). It is as though the courts do not know that this provision of § 3553 exists and is regarded by the Supreme Court as the most important consideration in sentencing. The district court simply resentenced the defendant to the same mandatory guideline sentence previously imposed before the *Booker* remand, as though no change in the law had occurred, and no further mental effort was called for.

This way of going about resentencing clearly violates the *Blakely-Booker-Cunningham* line of cases, as I have previously pointed out in a number of cases. *See United States v. Sexton*, 512 F.3d 326 (6th Cir. 2008) (Merritt, J., dissenting); *United States v. Phinazee*, 2008 U.S. App. LEXIS 2697 (6th Cir. Feb. 7, 2008) (Merritt, J., dissenting); and *United States v. Thompson*, 2008 U.S. App. LEXIS 2936 (6th Cir. Feb. 11, 2008) (Merritt, J., dissenting). The majority is simply refusing to apply the limitation on judicial fact finding that the *Blakely-Booker-Cunningham* line of cases imposes on sentencing judges and the courts of appeals. They have not carefully considered the *Cunningham* case decided a year ago. Six justices joined in the opinion. The *Cunningham* opinion opens by stating the question:

> The question presented is whether the DSL [the California determinate sentencing law], by placing sentence-elevating fact finding within the judge's province, violated the defendant's right to trial by jury safeguarded by the Sixth and Fourteenth Amendments. We hold that it does.

*Cunningham v. California*, 127 S. Ct. 856, 860 (2007). After stating the fact that the sentencing judge ratcheted up the defendant's sentence by one level based on judicial fact finding, the court began its analysis of the question in Section II, as follows:

> This court has repeatedly held that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence.

*Id.* at 863. The court then finds the basis for its decision in the *Blakely* precedent decided two years before:

> The judge could not have sentenced Blakely above the standard range without finding the additional fact of deliberate cruelty. Consequently, that fact was subject to the Sixth Amendment's jury trial guarantee. 342 U.S. at 304-314, 124 S. Ct. 2531. It did not matter, we explained, that Blakely's sentence, though outside the standard range, was within the 10-year maximum for class B felonies:
>
>> "Our precedents make clear . . . that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant* . . . . In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the judge has not found all the facts 'which the law makes essential to the punishment,' . . . and the judge exceeds his proper authority." *Id.* at 303, 124 S. Ct. 2531 (emphasis in original) (Quoting 1 J. Bishop, Criminal Procedure § 87, p. 55 (2d. ed. 1872)).

*Id.* at 865.[1] The court emphasized, reemphasized and then stated again that ratcheting up sentences through judicial fact finding violates the Sixth Amendment:

> If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied.

*Id.* at 869. Finally, the court makes it clear that Justice Breyer's remedial opinion in *Booker* in no way alters the rule against ratcheting up the sentence by judicial, factual findings of enhancements:

> *Booker*'s remedy for the federal guidelines, in short, is not a recipe for rendering our Sixth Amendment case law toothless. [Footnote 13] Justice Alito, however, would do just that. His opinion reads the remedial portion of the Court's opinion in *Booker* to override *Blakely*, and to render academic the entire first part of *Booker* itself.

In other words, the sentencing judge should start with the base offense level corresponding to the facts found by the jury verdict or admitted by the guilty plea. It should then consider the § 3553 factors, including mitigation and rehabilitation. The sentencing judge should not go up or down from the base offense level unless in his or her own mind the weighing process leads to a different sentence which the district judge must then explain. The judge should not engage in guidelinism, adjusting the sentence up just because he thinks the guidelines say so, as occurred in the instant case, but rather because the judge's own sense of justice, upon reflection, leads to a different result than the beginning, base-offense level. This allows the guidelines to play a pivotal role to begin with but requires the judge to use his or her own mental faculties and best judgment under § 3553, just as judges did in the days of indeterminate sentencing before the mandatory federal sentencing guideline era.

---

[1]Refusing to follow or even acknowledge and discuss the above language from *Cunningham*, repeated from *Blakely* and *Booker*, my colleagues in the majority say only that the defendants "exposed themselves to sentences of up to 240 months in prison (*i.e.*, 20 years) *based solely* on their guilty pleas for the drug offenses, *apart from any additional factfinding* by the district court." (Majority opinion § II.E, emphasis added.) The cases state repeatedly, as quoted above, that the "statutory maximum" for sentencing, factfinding purposes is not the highest sentence that could possibly be imposed under the statute but rather the highest sentence called for by guidelines based on the facts corresponding to the jury verdict or guilty plea, *i.e.*, before the sentencing judge begins any process of enhancement by finding new facts like a larger drug quantity or a management role in the offense. Judges seem so wedded to the pre-*Blakely-Booker-Cunningham* process that they simply evade any discussion of this language or the reasoning of the opinions. They fall back on the old judicial maxim: You may be excused for ignoring reasoning you cannot rebut. *Ignorantia Eorum Quae Quis Sure Tenetur Excusat.*