RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0033p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

CHARLES WILLIAM JOHNSTON,

        *Defendant-Appellant.*

No. 06-6397

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 05-00038—Jennifer B. Coffman, Chief District Judge.

Submitted: January 13, 2010

Decided and Filed: February 11, 2010

Before: SUHRHEINRICH, COLE, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Gerald L. Gulley, Jr., GULLEY OLDHAM PLLC, Knoxville, Tennessee, for Appellant. Charles P. Wisdom, Jr., Kenneth R. Taylor, ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Charles William Johnston pled guilty to mail fraud in connection with a fraudulent insurance scheme. Pursuant to the terms of his plea agreement, Johnston was sentenced to 25 months in prison and ordered to pay $1,000,000 in restitution. After Johnston failed to pay any of the restitution amount by the deadline provided in the plea agreement, the government filed a motion to resentence him pursuant to 18 U.S.C. § 3614. Finding that Johnston's total failure to pay restitution by the deadline was willful, the district court resentenced him to 51 months in prison and ordered

1

him to pay restitution for the full amount of the loss, jointly and severally with two of his codefendants, in excess of $6,600,000.

Johnston argues on appeal that the district court's willfulness finding was in error. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.      Plea agreement

In May 2005, Johnston was indicted along with four other defendants for perpetrating a fraudulent insurance scheme. Johnston pled guilty to one count of mail fraud, in violation of 18 U.S.C. § 1341. In return for his cooperation, he was relieved of joint and several liability with his codefendants for the full amount of the loss, which was in excess of $6,600,000. Instead, Johnston was sentenced in September 2005 to 25 months in prison and was ordered to pay $1,000,000 in restitution in a lump sum due on November 9, 2005. Johnston represented to the government that his net worth at the time was in excess of $3,000,000.

### B.      Evidentiary hearing

By March 2006, Johnston had paid nothing toward the restitution amount, leading the government to file a motion to resentence Johnston for willful failure to pay. The district court then held an evidentiary hearing to determine whether Johnston's failure to pay restitution was in fact willful.

During the hearing, various witnesses testified as to Johnston's financial affairs. Thomas Lee Gentry, the former chief of the Financial Litigation Unit within the United States Attorney's Office in Lexington, Kentucky, testified that he had previously deposed Johnston's wife, Margie, and Johnston's son, Jeremiah. According to Gentry, Johnston's family owned various assets, including several automobiles, commercial real estate, and rental properties, and they considered these assets to be "fungible within the family." He also noted that the family owned several profit-generating businesses, including multiple Quiznos (fast food) and Jackson Hewitt (tax preparation) franchises, as well as an accounting firm known as J and J Accounting. Gentry remarked that there was no evidence of any

efforts by Johnston or his family to liquidate these assets to pay his restitution obligation, and that the family "seem[ed] to be acquiring assets rather than disposing of them."

Next, Johnston testified on his own behalf. He stated that, at the time of the plea agreement, he had intended to pay the full amount of his restitution obligation. To further this aim, Johnston said that he had attempted to obtain a loan from the Small Business Association (SBA) and had hired a broker to help him value his Jackson Hewitt franchises. Johnston testified that although the broker valued the franchises at $2,000,000, no potential buyer was willing to pay more than $800,000. He added that he subsequently received an offer to sell back his Jackson Hewitt franchises to the franchisor for $300,000, but this was before Jackson Hewitt learned of Johnston's felony conviction. At that point, Jackson Hewitt withdrew its name from the franchises and made no further offer.

Following Johnston's testimony, David Rheinecker testified regarding a commercial-loan business that he had started with Johnston in the months leading up to Johnston's indictment. On the eve of Johnston's sentencing, Rheinecker submitted a letter to the court stating that Johnston had "completed sale of his Jackson Hewitt franchises," and that the parties were waiting on an SBA loan that Rheinecker expected to close within 60 days of the date of the letter. Rheinecker said that although he believed the letter to be accurate when it was written, he later came to believe that it "was used to assure the prosecutor or the Court that the plea agreement was valid." He added that Johnston could have obtained a $1,000,000 loan but, contrary to Rheinecker's advice, Johnston elected to turn it down.

According to Rheinecker, Johnston delayed accepting any loan until after Jackson Hewitt had withdrawn its name from Johnston's franchises, a move that significantly reduced their value. He speculated that Johnston did not want to close the loan because there was a debt against the Jackson Hewitt franchises that had not been disclosed to a potential third-party lender. Rheinecker also noted that he brokered a real estate refinancing in August 2005 that netted Johnston $73,000, but he was unaware of how those proceeds were used.

William Burford, an accounting-practices sales agent, was the next witness to testify regarding his business dealings with Johnston. Burford stated that in the months following Johnston's sentencing, he helped sell two of Johnston's businesses. Burford stated that he attempted to sell a third business of Johnston's, but "had difficulty" obtaining the

information he needed from Johnston. Despite this difficulty, Burford testified that he believed Johnston was making "a genuine attempt" to sell the business. Burford added that he also tried to obtain a loan on behalf of the Johnstons, but did not have the "cooperation level" he needed from Jeremiah Johnston to secure the loan.

Heidi McNeil, the general manager for Johnston's J and J Accounting business, was the last person to testify. McNeil stated that she acted as an intermediary for the business negotiations between Johnston and Rheinecker, and that Johnston had requested her to contact Burford regarding a loan because Rheinecker was acting too slowly. According to McNeil, Johnston knew in the spring of 2005 that the Jackson Hewitt franchises could not remain in Johnston's name because he was soon to become a convicted felon.

McNeil further testified that all of the proceeds from the sales of Johnston's businesses that Burford had helped arrange were used to pay employees, rent, and other overhead costs, as well as to pay off debt. She also stated that both she and Jeremiah possessed powers of attorney that authorized them to conduct Johnston's financial affairs while he was in prison.

At the conclusion of the hearing, the district court found that Johnston had "willfully failed and refused to pay" his restitution obligation. To support this finding, the court noted that Johnston had held on to his Jackson Hewitt franchises despite his knowledge that the franchises would lose significant value once Jackson Hewitt learned of Johnston's felony conviction. The court then determined that Johnston had used Rheinecker and their joint commercial-loan business to give the appearance that Johnston was about to obtain an SBA loan, and it found that Rheinecker's letter to the court contained false statements and was written with Johnston's knowledge and consent. It further rejected Johnston's claim that his imprisonment had hindered his efforts to pay restitution, pointing out that Johnston gave McNeil and Jeremiah powers of attorney and that Johnston had made several telephone calls from prison. Asserting that Johnston's willfulness was not a "close question," it concluded that Johnston had attempted to "play the Government and the Court like a fiddle from the beginning" of the case.

**C.      Resentencing**

Johnston was resentenced in October 2006.  By this time, two of Johnston's codefendants, one of whom had negotiated a plea agreement and another who was convicted by a jury, had paid close to $4,000,000 of the $6,635,054.18 owed in total restitution.  (The remaining two codefendants were not ordered to pay restitution.)  The court noted that one of the codefendants "promptly" paid a lump sum of $500,000, and that the government had seized $3,000,000 to $4,000,0000 of the other's assets.  In contrast, Johnston had paid only $14,000, all coming in after the evidentiary hearing but before his resentencing.  Based on its findings during the evidentiary hearing, the district court increased Johnston's sentence to 51 months in prison and ordered that he be jointly and severably liable, along with two of his codefendants, for the full balance of the restitution owed.

## II.  ANALYSIS

**A.      Standard of review**

Johnston's sole challenge on appeal is to the district court's finding that his failure to pay restitution was willful.  This court reviews a district court's factual findings in connection with a sentencing under the clear-error standard.  *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008).  A district court's decision is clearly erroneous "where, having reviewed all of the evidence, we are left with the definite and firm conviction that a mistake has been made."  *Id*.

**B.      Discussion**

The district court increased the restitution amount Johnston owes pursuant to 18 U.S.C. § 3614.  Under that statute, where a defendant "knowingly fails" to pay restitution, a court "may resentence the defendant to any sentence which might originally have been imposed."  18 U.S.C. § 3614(a).  Such resentencing is permissible where a restitution debtor has "willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay."  *Bearden v. Georgia*, 461 U.S. 660, 672 (1983).

This court addressed a similar resentencing for failure to satisfy a restitution obligation on one other occasion, in *United States v. Menichino*, 103 F. App'x 884 (6th Cir. 2004). There, Menichino had set up a "sham" trust while on supervised release and, despite hundreds of thousands of dollars flowing through the trust's accounts, had paid only $7,000 of his $300,000 restitution obligation. *Id.* at 885-86. The court affirmed the district court's finding of willfulness because Menichino "had been intentionally obscuring his financial condition," with the trust merely "provid[ing] a cover for Menichino's activities involving hundreds of thousands of dollars." *Id*. at 887. Similarly, the Eighth Circuit found willfulness to exist where a restitution debtor engaged in deceptive and misleading behavior. *See United States v. Montgomery*, 532 F.3d 811, 814 (8th Cir. 2008) (affirming the district court's finding of wilfulness where Montgomery exhibited a "history of manipulation," including the making of various excuses as to why she was unable to maintain steady employment, and had made payments towards her restitution obligation only in miniscule amounts when she was employed).

Johnston's conduct was likewise misleading. As the district court noted, Rheinecker, with Johnston's knowledge and consent, wrote a letter to the court containing "false statements," including the misrepresentation that Johnston was about to obtain an SBA loan. The court further found that Johnston's dealings with Rheinecker in general were "designed to make it look as though the loan was going to take place." Moreover, Johnston failed to disclose prior to sentencing that he, as a convicted felon, would be unable to retain his Jackson Hewitt franchises and that his tax-preparation business would depreciate in value as a result.

In addition to the district court's reliance on the above facts in its stated reasons for the willfulness finding, further evidence presented at the evidentiary hearing supports the court's conclusion. The Johnston family had numerous assets, for example, including automobiles, commercial real estate, and rental properties, but instead of liquidating these assets, they appeared to be acquiring new ones. Johnston also turned down an $800,000 offer for his Jackson Hewitt franchises, and he used the proceeds from the sale of some of his other businesses to pay off his own debt rather than to make restitution. And unlike the

restitution debtors in *Menichino* and *Montgomery*, and also unlike his two codefendants who were ordered to pay restitution, Johnston made no payments at all until after his evidentiary hearing. Johnston contended at the evidentiary hearing that he was unaware of any opportunity to make partial payments, but there is no evidence that he made any effort to verify this belief or to request an extension of the payment deadline. *See United States v. Reid*, 275 F. App'x 911, 914 (11th Cir. 2008) (faulting a restitution debtor for not contacting his probation officer "to discuss his financial difficulties and request a different payment schedule").

To support his argument that the willfulness finding was erroneous, Johnston claims that his efforts to pay were "frustrated by events and acts beyond his control." He emphasizes his attempt to obtain an SBA loan as well as his efforts to sell his Jackson Hewitt franchises prior to the termination of his franchise rights. And he maintains that although other businesses he owned were generating money while he was in prison, the funds had to be used to pay employees, rent, and overhead expenses, leaving nothing to pay toward his restitution obligation. None of these points are persuasive, however, because they do not refute the district court's factual findings evidencing Johnston's deception and manipulation regarding his finances. We therefore conclude that the district court's wilfulness finding was not clearly erroneous.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.