NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0117n.06

No. 18-1522

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Mar 13, 2019 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| EARL LEE COBB, IV, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| Defendant-Appellant. | ) | DISTRICT OF MICHIGAN |

Before: KEITH, MERRITT, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge.  Earl Lee Cobb pleaded guilty to one count of bank fraud and one count of conspiracy to commit bank fraud.  He was sentenced to 78 months' imprisonment.  Cobb appeals, challenging the district court's upward departure pursuant to U.S.S.G. § 3B1.1 for his managerial responsibility over the property, assets, or activities of a criminal organization and the court's failure to award an adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.  Cobb also challenges the substantive reasonableness of his sentence.  We AFFIRM.

I.

In August 2017, Cobb and eighteen co-defendants were charged in a 28-count indictment for their roles in an expansive bank fraud conspiracy carried out in Illinois and Michigan.  The scheme involved the exploitation of thirty Bank of America bank accounts, specifically (1) recruiting individuals to open Bank of America accounts for the sole purpose of conducting fraud; (2) obtaining stolen checks drawn on Bank of America business accounts; (3) altering the stolen checks to replace the intended payees with the names of co-conspirator Bank of America

account holders; (4) obtaining and using the Bank of America account holders' account information and Personal Identification Numbers (PINs) at "Teller Assist" ATM machines[1] in Chicago to deposit the fraudulent checks into their accounts; (5) directing and supervising fraudulent withdrawals by Bank of America account holders at casinos, ATMs, and banks; and (6) sharing proceeds between the co-conspirators in Michigan and Illinois. Count 1 of the indictment charged all nineteen co-defendants with conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344(2) and 1349. Counts 2 through 28 charged varying subgroups of co-defendants with individual counts of bank fraud, in violation of 18 U.S.C. §§ 2 and 1344(2).

Cobb was the only defendant charged in every single count of the indictment. His role in the criminal scheme involved depositing fraudulent checks, totaling $780,229.96. Once the checks were deposited, he and his co-conspirators would capitalize from the bank's practice of advancing or "floating" funds to its account holders by withdrawing the advanced funds before the bank realized that the checks were bad. Cobb also traveled to Michigan on at least fifteen different occasions to collect fraudulent proceeds from his co-conspirators and bring those proceeds back to Chicago to distribute among his co-conspirators there. Cobb earned $500 for every successful fraudulent withdrawal from a bank account used in the scheme.

In November 2017, Cobb entered a plea agreement in which he agreed to plead guilty to one count of conspiracy to commit bank fraud (Count 1) and one count of substantive bank fraud (Count 2). Nearly two months later, Cobb participated in a presentence interview. There, he told the probation officer that a man named "Slim" had recruited him to the conspiracy via Facebook. Cobb stated that every time he met Slim, there was also a "white person" with him, but Cobb said

---

[1] "Teller Assist" ATMs are equipped with video screens that allow ATM users to interact with a live virtual teller. These ATMs do not require its users to have a Bank of America debit card to make a deposit.

the "white person" never spoke. Cobb said that Slim gave him checks and told him where to deposit the checks. Cobb noted that the checks were already prepared; they had account numbers and names on them. Cobb said he made thirty-two deposits, received marijuana for his participation, and was supposed to get money as well but only received $250 a few times. When the probation officer asked Cobb about his relationship with his co-defendants, he said he only knew one of them—his cousin Tirrell Thomas—and that he had never spoken to Thomas or any other co-defendant about the fraudulent scheme.

In the initial Presentence Investigation Report (PSIR), released in February 2018, the probation officer did not recommend a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. Additionally, the probation officer recommended a four-level upward adjustment for Cobb's role in the offense pursuant to § 3B1.1(a). Cobb objected to both recommendations.

Approximately three weeks before his sentencing date, and nearly three months after the initial PSIR interview, Cobb requested and received a follow-up presentence interview. During that interview, he admitted that he had lied during his initial interview. He apologized and explained that he had done so because he was afraid he would receive a lengthy prison sentence if he had described his actual role in the scheme. Cobb explained that nearly everything he told the probation officer about his role in the scheme during his initial PSIR interview was fabricated. "Slim" did not exist, and Cobb had not been recruited via Facebook. Cobb knew most of the co-conspirators, and he made fifteen or more trips to Michigan to exchange money obtained from the offense. He also acknowledged that he received $500 for each fraudulent withdrawal.

Following this second interview, the probation officer revised the PSIR to recommend a two-level increase pursuant to U.S.S.G. § 3C1.1 for obstruction of justice. The PSIR continued to recommend that the court deny an acceptance-of-responsibility reduction pursuant to § 3E1.1 and

apply a four-level enhancement under U.S.S.G. § 3B1.1(a) for Cobb's role in offense. With an offense level of 27 and a criminal history category of II, Cobb's Guidelines range was calculated at 78 to 97 months' imprisonment.

In its sentencing memorandum, the government conceded "that an offense level increase under § 3B1.1 is presently not supported by the evidence." The government argued, however, "that an upward departure equivalent to a 4-level increase in offense level" was warranted under Application Note 2 to § 3B1.1 because Cobb "'exercised management responsibility over the property, assets, or activities' of an expansive criminal organization." The court agreed that an upward departure was appropriate but applied a two-level departure instead of the four-level departure that the government had requested. This departure resulted in a Guidelines range of 63 to 78 months' imprisonment. After considering the sentencing factors set forth in 18 U.S.C. § 3553(a), the district court sentenced Cobb to 78 months' imprisonment—the top of the post-departure Guidelines range. Cobb appeals.

## II.

Cobb first contests the district court's failure to grant him a decrease in offense level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. Cobb does not challenge the district court's increase in his offense level for obstruction of justice pursuant to U.S.S.G. § 3C1.1. And he acknowledges "that as a result he 'ordinarily' would not get the Acceptance of Responsibility reduction." Yet he argues that his is the "extraordinary" case in which a defendant who has obstructed justice can also be found to have accepted responsibility. *See* U.S.S.G. § 3E1.1 cmt. n.4 (noting that there may "be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply"); *see also United States v. Jeross*, 521 F.3d 562, 581 (6th Cir. 2008) (same). Cobb contends that it would be "extraordinary to continue to deny him acceptance of responsibility

in light of his timely guilty plea, his corrected and truthful statement to probation, and use of facts from that corrected statement by the district court to depart upward."

We consider several factors when determining whether a reduction is warranted for acceptance of responsibility. *Jeross*, 521 F.3d at 582. These factors include: (1) "the defendant's truthful admission of the charged offense"; (2) "the defendant's voluntary assistance to authorities in resolving the offense"; and (3) "the timeliness of the defendant's conduct in affirmatively accepting responsibility for his actions." *Id.* Cobb shoulders "the burden of proving the extraordinary nature of his . . . case where obstruction of justice has occurred." *Id.*

Cobb compares his case to *United States v. Williams*, 176 F.3d 301, 311 (6th Cir. 1999) and *United States v. Gregory*, 315 F.3d 637, 641 (6th Cir. 2003), two cases in which we upheld the district court's decision to grant a reduction for acceptance of responsibility, even though the defendants had been found to have obstructed justice. In those cases, Cobb reminds us, "there was a singular attempt by the defendant to obstruct justice that was quickly and completely remedied before law enforcement (in *Gregory*) or the district court (in *Williams*) was led astray." This may be an apt description of *Williams* and *Gregory*, but not of Cobb's own case.

In *Gregory*, for example, we emphasized that "[a]ll of [the defendant's] obstructive conduct predated his indictment" and that "[l]ong before he was ever charged with an offense, Gregory cooperated with prison officials, and he pleaded guilty." 315 F.3d at 641. Cobb, by contrast, lied in his initial interview with the probation officer, five months after he and his co-defendants were indicted. Months after his initial interview, he continued to stand by his deceitful statements to the probation officer. It was not until he realized that the probation officer had decided not to recommend a decrease for acceptance of responsibility, and to recommend a four-level increase for his role in the offense, that Cobb attempted to come clean. In fact, Cobb admitted

this at sentencing. This was at least two months after Cobb's initial interview and seven months after indictment. We cannot say, as Cobb claims, that Cobb's was a "singular attempt by the defendant to obstruct justice that was quickly and completely remedied."

In terms of timing and motivation, Cobb's case resembles more closely those in which we have upheld a district court's determination that no "extraordinary circumstances" warranted granting an acceptance of responsibility reduction to a defendant who had obstructed justice. In *Jeross*, for example, we found that the defendant had "failed to meet the 'exacting standard'" of demonstrating "extraordinary circumstances" when "all of Jeross's obstructive conduct occurred at or after his indictment." 521 F.3d at 582. There, Jeross "denied his guilt for over four months after his indictment and challenged both his role in the offense and the amount of drugs involved until the date of his original sentencing hearing." *Id.* And in *United States v Romanini*, we found that the defendant's belated disclosure of truthful information could not "be considered truly voluntary" because the defendant "told the truth only after he was caught in a lie." 502 F. App'x 503, 512 (6th Cir. 2012).

While Cobb did not repeatedly lie to the investigators and eventually corrected his false statements to the probation officer, his intentionally false statements came after his indictment and guilty plea. Cobb did not attempt to correct his false statements until he learned of the probation officer's recommendations, that is, until he feared the consequences of his deceit. There is, moreover, no evidence that Cobb substantially assisted the government in its investigation. Cobb argues that he provided assistance when he told the government that he made fifteen trips to Michigan to collect proceeds of the scheme, but the government had already learned of at least six such trips to transfer money from Cobb's co-defendant.

Thus, there is nothing extraordinary about this case that warrants an adjustment under § 3E1.1 despite the defendant's having obstructed justice pursuant to § 3C1.1. Recognizing that our circuit has "consistently granted district courts great leeway when making this determination," *Jeross*, 521 F.3d at 582 (quoting *Gregory*, 315 F.3d at 640), we conclude that the district court did not err.

### III.

Cobb next challenges the district court's decision to impose a two-level upward departure for exercising managerial responsibility over the property, assets, or activities of the conspiracy. *See* U.S.S.G. § 3B1.1 cmt. n.2 ("An upward departure may be warranted . . . in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization."). Cobb admits that he played an "essential role" in the scheme but denies a managerial or supervisory role. We find it unnecessary to decide whether Application Note 2 supported the district court's upward departure because the district court's statement that it would, in the alternative, vary upward from the advisory guideline range is sufficient to justify the sentence imposed. The district court judge stated that "if [he] hadn't applied the upward departure pursuant to [§ ]3B1.1, [he] would have varied upward two levels, because [he] th[ought] the guideline range of 51 to 63 d[id] not provide sufficient punishment for Mr. Cobb nor d[id] it provide significant or sufficient general deterrence of others who might contemplate similar criminal activity." The court made it clear that its intention was "to sentence Mr. Cobb at the upper end of the advisory guideline range after the application of the upward departure." The court cited general and specific deterrence, noting that this was Cobb's second felony theft-related conviction and that this criminal activity followed shortly after the first, which was "concerning to

the Court." We find that the district court's decision to vary upward was sufficient to justify the sentence imposed; therefore, any error in imposing an equivalent departure was harmless. *See United States v. O'Georgia*, 569 F.3d 281, 288 (6th Cir. 2009) ("[E]rroneous application of a departure provision is harmless where the district court independently supports its choice of a sentence by a proper use of the § 3553(a) factors"); *United States v. Obi*, 542 F.3d 148, 156 (6th Cir. 2008) (explaining that "[e]ven assuming the sentencing court improperly enhanced [the defendant's] sentence . . . this does not constitute reversible error" because it is harmless where the "sentencing judge explicitly stated that he would impose the same sentence on alternative grounds"); *see also United States v. Rodriguez*, 915 F.3d 532, 535 (8th Cir. 2019); *United States v. Hentges*, 817 F.3d 1067, 1068 (8th Cir. 2016).

IV.

Cobb's final challenge is to the substantive reasonableness of his sentence. He argues that his sentence was substantively unreasonable because the district court put an unreasonable amount of weight on the offense conduct while discounting Cobb's minimal criminal history, his good work history, and the fact that he had never spent more than four days in jail. Cobb also argues that the district court "harped on Mr. Cobb's 15 trips to exchange money with the Michigan co-conspirators."

"A claim that a sentence is substantively unreasonable is a claim that a sentence is too long . . . ." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). We review this claim for an abuse of discretion. *Id.* We give "due deference" to a district court's finding that a sentence imposed is warranted by the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 51 (2007).

The district court stated the following at sentencing:

> The issue for the Court, as far as the formulation of a sentence for Mr. Cobb[,] requires the Court to focus on several 3553 factors. First, general deterrence of others who might contemplate similar criminal activity.
>
> This was a brazen fraud, and Mr. Cobb was one of the lynchpins of the fraud. He collected the proceeds. He made the fraudulent check deposits. He was a major player in this fraud.
>
> Second, he's got a prior theft related felony conviction in Illinois, when he was about 21 years old. Obviously[,] Mr. Cobb didn't learn too much from his experience in the courts of Illinois with his involvement in that particular case, because he is involved in this fraudulent activity shortly thereafter, not immediately, but shortly thereafter, this offense having concluded at the end of 2015.
>
> * * *
>
> But in any event[,] general deterrence of others who might contemplate similar criminal activity is a factor for the Court to consider. Specific deterrence of Mr. Cobb, too. This is his second felony prior—this is his second felony theft related conviction, and that is concerning the Court as well.

While the district court made no mention of Cobb's fifteen trips to collect proceeds from co-conspirators in Michigan when it considered the relevant § 3553(a) factors other than to say Cobb "collected the proceeds," the court did consider this evidence when imposing the upward departure. But a court does not err when it sentences a defendant based on uncontested facts in the PSIR or facts that the defendant himself has admitted. *See United States v. Vonner*, 516 F.3d 382, 384–85 (6th Cir. 2008) (en banc); *United States v. Salas*, 281 F. App'x 496, 500 (6th Cir. 2008); *United States v. Bergold*, 194 F. App'x 348, 353 (6th Cir. 2006). And to the extent that Cobb argues the district court should not have considered his trips to collect proceeds because it had already taken them into account when determining whether to award a reduction for acceptance of responsibility, we have rejected this argument. *See United States v. Tristan-Madrigal*, 601 F.3d 629, 636 n.1 (6th Cir. 2010).

The district court did not abuse its discretion.  The court carefully balanced the factors and concluded that a 78-month sentence, within the post-departure Guidelines range, was appropriate to serve the goals of sentencing.

* * *

For the reasons set forth above, we AFFIRM the judgment of the district court.