<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 19a0459n.06

Case Nos. 18-5904/5905

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| LLOYD MONTGOMERY and DOMINIQUE | ) | DISTRICT OF TENNESSEE |
| EUGENE LUCAS, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

FILED

Aug 30, 2019
DEBORAH S. HUNT, Clerk

**O P I N I O N**

BEFORE: MOORE, COOK, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Lloyd Montgomery and Dominique Lucas were indicted for their roles in an opiate distribution conspiracy in Clarksville, Tennessee. Both defendants pled guilty and were sentenced to 240 months and 180 months, respectively. In a consolidated appeal, we vacated both sentences and remanded. In Montgomery's case, we found that the district court failed to give any explanation of its estimate of the amount of drugs comprising the scope of the conspiracy. In Lucas's case, we found that the district court failed to give any explanation for its chosen sentence. On remand, the district court conducted new sentencing hearings and resentenced each defendant to the same term. In this second appeal, Montgomery and Lucas re-raise the same challenges presented in their first appeal. This time around, we affirm

Montgomery's sentence; however, we once again vacate Lucas's sentence and remand for resentencing.

## I.  Procedural History

On October 28, 2015, a federal grand jury indicted Lloyd Montgomery, Dominique Lucas, and Brian Merriweather.  The indictment charged that the three had been members of a conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1), among other crimes.  The charges arose from defendants' roles in distributing prescription opiates in Clarksville, Tennessee.  Another defendant, Charles Reeves, was later indicted on a firearms charge.

Montgomery, Lucas, and Reeves eventually entered guilty pleas, but Merriweather chose to go to trial.  At trial, the government presented a variety of evidence, including text messages and call logs from Montgomery and Merriweather's phones and testimony from witnesses Anthony Seay and Raymond Poindexter, both of whom were offered cooperation agreements in exchange for their testimony.  The government also offered evidence of nearly a dozen controlled purchases of pills from Montgomery, some of which involved Merriweather or Lucas.  Merriweather was convicted on all counts.

All four defendants were sentenced on January 4, 2017.  Montgomery, Merriweather, Lucas, and Reeves received terms of imprisonment of 240 months, 216 months, 180 months, and 60 months, respectively.  All four defendants appealed.

In a prior, consolidated appeal, we affirmed the sentences of Merriweather and Reeves but vacated the sentences of Montgomery and Lucas.  *See generally United States v. Merriweather, et al.*, 728 F. App'x 498 (6th Cir. 2018).  On remand, the district court resentenced both defendants

to the same terms originally imposed. Montgomery and Lucas have appealed for a second time, re-raising the issues on which their cases were remanded.

## II. Lloyd Montgomery

As in his prior appeal, Montgomery challenges the district court's determination that he was responsible for the sale of 5,000 oxymorphone pills from February 2013 to October 2015, arguing that the evidence does not support that estimated quantity.

### *A. Background*

In order to assess whether the record supports the district court's estimate, a review of the evidence of the drug activity in this case is warranted. In February 2013, police executed a search warrant on a residence in Clarksville and recovered bottles containing 22 suspected oxymorphone pills and 64 suspected oxycodone pills, as well as other suspected drugs, drug paraphernalia, and a firearm. A woman with whom Montgomery was in a relationship was present and informed police that, while Montgomery did not reside at the house, he paid the rent and visited the house at will. She also told police that he sold pills from the residence.

Anthony Seay was one of the cooperating witnesses at Merriweather's trial. Seay began cooperating with police after police executed a search warrant on Seay's house, in order to avoid prosecution for his own drug distribution. In Seay's initial interview, he told police that Montgomery had been selling 15mg Opana (oxymorphone) pills for $60 each since 2013 and that he sponsored twelve people to secure prescription drugs from Clarksville doctor offices. Seay also mentioned Montgomery's ownership of the "Stacker" house, the main locus of the conspiracy. In another interview, Seay initially estimated that he had bought oxymorphone and oxycodone from Montgomery about 50 times. He then re-estimated in terms of purchases-per-week, stating that he had purchased drugs from Montgomery several times per week for three years, though not every

week, and had on occasion purchased multiple times in one day. He noted that Montgomery always kept the pills for sale in a prescription bottle. He also stated that there were "always a bunch of people at Stacker." Finally, in another interview, Seay stated that Montgomery would accept goods instead of money for the drugs, including tires, jewelry, firearms, etc. Seay also estimated that Montgomery was paying (and sometimes transporting) three or four people to go to doctor appointments and get prescriptions.

Raymond Poindexter was the second cooperating witness at Merriweather's trial. Poindexter was already incarcerated for a theft conviction when he began cooperating with police. Poindexter was a pill addict when he learned about Montgomery's sales, and he stated that, in 2015, he bought one to three oxymorphone pills from Montgomery every day for about two-and-a-half months, totaling at least 150 pills. He also told police that Montgomery carries three bottles of pills with him to sell, two bottles of oxymorphone and a bottle of other varieties. He also noted that Montgomery would fill prescriptions at Walmart and K-Mart, and that he once saw Montgomery sell half a prescription—30 pills—in under an hour. Poindexter financed his own drug habit by stealing goods from stores to trade to Montgomery. In another interview with investigators, Poindexter positively identified Montgomery, Merriweather, and Lucas and stated that all three sold drugs out of Stacker and that at least one of them was always present.

At trial, Seay testified that he began buying pills from Montgomery about eight years prior and that he always purchased oxymorphone, even though Montgomery also carried oxycodone. Seay testified that he purchased pills two or three times a week, though he had on occasion purchased drugs more than once in the same day. He also noted that Montgomery kept the pills in a bottle on his person. While Seay purchased drugs at several locations, the main location was Stacker, where Seay said "there would always be a bunch of people in the house, cars parked

everywhere." Seay noted that he saw others purchase drugs from Montgomery at the house on several occasions, and reaffirmed that Montgomery took goods in trade. He also testified that one of his friends was one of the people Montgomery paid to go to a particular local doctor—Doctor Orusa—and get pill prescriptions. Finally, he stated that he had signed a nonprosecution agreement in exchange for his testimony and confirmed that police had used him to make controlled narcotics buys from the defendants.

Poindexter also testified at Merriweather's trial, where he told the jury that he began buying from Montgomery about the time he got out of prison early in 2015, and that he would steal items and trade them to Montgomery for pills on "almost a daily basis." Poindexter testified that he purchased drugs at Stacker, where there would usually be "a couple people in the living room, people in the kitchen selling pills," and that drugs could be had at almost any time of day or night. Even if Montgomery wasn't there, someone would be there to sell. Poindexter also recounted running into Montgomery once at K-Mart, where Montgomery had dropped a woman off to fill a pill prescription, and he testified that Montgomery usually sent people to Dr. Orusa to get the prescriptions. Finally, Poindexter stated that he had been offered a nonprosecution agreement in exchange for his cooperation.

Evidence of drug activity also derives from data retrieved from Montgomery and Merriweather's phones, which contained various calls among members of the conspiracy and text messages from people looking to buy and sell pills. Dozens of text messages reference oxymorphone, oxycodone, stolen merchandise for trade, doctor appointments, and prescriptions. Police also executed at least eleven controlled buys of narcotics from the defendants with the aid of Seay. Montgomery was the seller in most of the transactions and aided with the rest. Nearly all of the buys yielded two oxymorphone pills each.

*B. Analysis*

We review the district court's drug-quantity determination for clear error. *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008). If the exact amount of drugs is undetermined, the court may make an estimate, but the estimate must be supported by a preponderance of the evidence. *Id.* In so doing, the court may rely on physical evidence and testimonial evidence, even where the testimony is given by a witness who may receive a reduced sentence in exchange for testifying. *See id.*; *United States v. Henley*, 360 F.3d 509, 516 (6th Cir. 2004). But the court should err on the side of caution, and the finding must have "some minimum indicium of reliability beyond mere allegation." *United States v. Ward*, 68 F.3d 146, 149 (6th Cir. 1995). "A district court's approximation of drug quantity is not clearly erroneous if it is supported by competent evidence in the record." *Jeross*, 521 F.3d at 570.

In reviewing a district court's drug-quantity determination, "a key issue is the extent to which the court identified the evidence on which it relied." *Henley*, 360 F.3d at 515 (collecting cases). The court has a "duty to support its finding" regarding the total drug quantity involved in a conspiracy. *United States v. Hernandez*, 227 F.3d 686, 698 (6th Cir. 2000). Where the court "fails to identify the evidence on which it relied," we have remanded for resentencing. *Ward*, 68 F.3d at 149. *See also United States v. Cook*, 13 F. App'x 331, 339 (6th Cir. 2001); *Hernandez*, 227 F.3d at 698; *United States v. Walton*, 908 F.2d 1289, 1302–03 (6th Cir. 1990).

Montgomery's presentence report recommended a finding that the conspiracy was responsible for the distribution of ten pills a day, or 9,500 oxymorphone pills over the course of 950 days, which would yield a base offense level of 34.[1] At Montgomery's initial sentencing, the

---

[1] According to the government, an oxymorphone pill weighs 220mg per pill, so the total weight of 9,500 pills is 2,090 grams, which converts to 10,450kg of marijuana under the guidelines. *See* U.S.S.G. § 2D1.1(c)(3) and application note 8(D).

district court expressed discomfort with this estimate, especially because the court did not regard Seay and Poindexter as "particularly reliable" witnesses. After a recess, the court announced a new estimate of 5,000 pills, or just over five pills per day, without offering any explanation of the figure.[2] Apparently concerned with the court's lack of analysis, the government asked for "a little more specificity" for purposes of appeal, to which the court replied:

> Well, specificity is I'm recalling the testimony of the two witnesses and all the other testimony and the factors that you've mentioned. I've considered your calculations.

> As far as going by each witness and each day and figuring out exactly how many pills, I can't do that, but I think that 5,000 is a good conservative estimate based on the continuing activity, and that's as specific as I can get.

R. 295, Sentencing Hr'g Tr., PID 2941.

In Montgomery's initial appeal, we vacated his sentence because we agreed that the district court failed to identify any of the facts upon which it relied or to explain its determination, beyond the "hazy generality" of a reference to "continuing activity." *Merriweather*, 728 F. App'x at 521. We then remanded for resentencing, allowing that 5,000 pills might be a reasonable estimate but directing that the district court make "particularized findings" to support its determination. *Id.*

On remand, the parties reviewed the evidence of drug activity in the case, after which the court stated the following:

> I'm satisfied that the 5,000 pills is the appropriate amount. This finding is based on the testimony of Anthony Seay who said that Mr. Montgomery and his co-conspirators were selling pills 24/7. That was during Mr. Montgomery's co-conspirators' trial; the testimony of Raymond Poindexter, a drug user, who also testified about the magnitude of the conspiracy during Mr. Montgomery's co-conspirators' trial; the cell phone records showing interactions between Mr. Montgomery and a co-conspirator [who] went to trial, which included numerous drug-related text messages. These messages corroborated the testimony of Mr. Seay and Mr. Poindexter.

---

[2] The total weight of 5,000 oxymorphone pills would be 1,100g, which converts to 5,500kg of marijuana, yielding a base offense level of 32. R. 295, Sentencing Hr'g Tr., PID 2926.

> The police reports mentioned seizure of numerous drugs and items of drug paraphernalia during the execution of the search warrant at [redacted] on February 22, 2013, a residence that was associated with Mr. Montgomery, the drugs obtained during controlled buys in this case. Some of the testimony may have been exaggerated, and saying that someone sold five pills a day for the entire scope of the conspiracy is a difficult proposition. It could have been more, it could have been less.

> After considering all of this evidence together, though, I believe that 5,000 pills is definitely appropriate.

R. 333, Resentencing Hr'g Tr., PID 3287–88. The district court then imposed the same sentence it had previously imposed.

Montgomery again appeals, claiming as a preliminary matter that the district court again failed to offer enough explanation for its finding. Although the court's latest explanation is uninspiring, it is enough to meet the minimum requirements of our precedent. The court does identify a few of the facts on which it relies, including the testimony that drug sales occurred "24/7," that the testimony was corroborated by "numerous" drug-related text messages, the quantity of drugs found during the February 2013 search warrant, and the quantity of drugs obtained during controlled buys. The court then links these facts to an estimate of five pills per day. Because the district court covered the basics, we do not find a need to remand for further explanation.

We now turn to Montgomery's main, related objection that the facts of the case simply do not support the district court's estimate. Montgomery argues that, because police secured only a small fraction of the 5,000-pill estimate through the search warrant and controlled buys, the bulk of the estimate depends on Seay and Poindexter's assertions that drug transactions were continuously occurring at Stacker. Montgomery highlights the court's statements that the witnesses were not "particularly reliable" and that some testimony "may have been exaggerated." And he emphasizes his view that the testimony remains uncorroborated—for instance, he argues

that police reports from the controlled buys did not indicate the presence of cars parked around Stacker or people inside conducting transactions, in contrast to Seay and Poindexter's testimony about continuous drug activity at the residence. Furthermore, during sentencing, Montgomery protested that he often didn't have pills to sell when Seay would call at the behest of police, proving that he didn't have pills to sell "every day."

Despite Montgomery's legitimate concerns, the district court's estimate—about five pills per day—is supported by competent evidence in the record.[3] *See Jeross*, 521 F.3d at 570. Although the court had concerns with Seay and Poindexter's credibility, it is evident that the district court decided to credit their testimony to some degree, and we afford that credibility determination "great deference." *Id.* Nor was it illegitimate for the court to rely on the testimony of cooperating witnesses, even though the witnesses stood to benefit from their cooperation. *See Henley*, 360 F.3d at 516.

Furthermore, non-testimonial evidence corroborates the fact that Montgomery had continuous access to a flow of drugs. First, police found about 86 oxymorphone and oxycodone pills in bottles at Montgomery's residence in February 2013. Second, police conducted nearly a dozen controlled buys during the summer of 2015, yielding more than twenty pills in total. Third, both witnesses separately told investigators that Montgomery kept pill bottles on his person in order to facilitate transactions, like those discovered during the February 2013 search.

Fourth, and most importantly, it is undisputed that Montgomery was actively sponsoring people to receive and fill pill prescriptions. In pretrial interviews, Seay estimated that Montgomery

---

[3] We need not separate evidence of pills sold by Montgomery from evidence of sales by his co-conspirators. As ringleader and most active participant in the conspiracy, Montgomery was responsible for all distribution, as we accepted in our prior opinion. *See Merriweather*, 728 F. App'x at 520.

was sponsoring at least three or four people, and as many as twelve people. At trial, Seay testified that Montgomery had prescriptions filled at Walmart and K-Mart and that one of Seay's own friends was sponsored by Montgomery. Poindexter testified at trial that he was present on one occasion when Montgomery had transported a woman to K-Mart to fill a prescription. This testimony dovetails with text messages downloaded from Montgomery's cell phone, in which contacts coordinate times and payment for doctor appointments and prescription refills. Seay told police he once saw Montgomery sell half of a prescription—30 pills—in under an hour. If a full prescription is usually 60 pills, Montgomery would need less than three oxymorphone prescriptions filled per month to sell five pills per day.

In conclusion, given both the testimonial and non-testimonial evidence in the record, the district court's estimate of 5,000 pills from February 2013 to October 2015 was not clearly erroneous.

### III. Dominique Lucas

As in his prior appeal, Lucas challenges his sentence on two grounds. First, he argues that the district court committed procedural error by failing to explain the chosen sentence, especially with reference to Lucas's arguments for a substantial downward variance. Second, he claims his sentence is substantively unreasonable. Because we agree with Lucas's first claim, we need not reach the second.

### A. Background

Evidence of Lucas's involvement in the conspiracy stems mainly from his participation in only two of the controlled buys conducted by police, yielding three-and-a-half oxymorphone pills. Lucas pled guilty to participation in the conspiracy from March 1 to September 30, 2015. Based on the district court's estimate of 5,000 oxymorphone pills over the course of the whole conspiracy,

this meant Lucas was responsible for 1,120 pills, yielding 1,232kg of marijuana. Because of Lucas's career offender status under U.S.S.G. § 4B1.1, the guidelines range was 188 to 235 months.

During Lucas's original sentencing, he declined to challenge the drug type or rate of distribution established during Montgomery's sentencing or the corresponding guidelines range calculation. But he took the position in his sentencing memo and at the sentencing hearing that the unreliability of the witnesses, arbitrariness in the drug calculation, the government's harsh decision to file notice under 21 U.S.C. § 851, and severe childhood challenges merited a significant downward variance under the factors listed in 18 U.S.C. § 3553(a). The district court did grant a downward variance, but only a slight one, sentencing Lucas to 180 months and stating that the sentence was "based on [the] Sentencing Reform Act of 1984 and on 18 U.S.C. Section 3553."

Lucas appealed, claiming first that the district court had committed procedural error in failing to address the § 3553 factors and his proffered arguments for a lower sentence and second that his sentence was substantively unreasonable. We ruled for Lucas on the former and declined to reach the latter. While we noted that the district court had ruled on Lucas's objections to the presentence report and heard testimony from a psychologist about Lucas's childhood and mental abilities, we found that the district court neither addressed Lucas's arguments for a downward variance nor explained the chosen sentence "with at least some reference to the § 3553 factors." *Merriweather*, 728 F. App'x at 526.

On remand, Lucas again chose not to challenge the district court's guidelines calculation and again took the position that the court should grant a significant downward variance under the § 3553 factors. The district court then reimposed a sentence of 180 months. Lucas appeals,

arguing that the district court again committed procedural error by failing to explain his sentence, especially by failing to address Lucas's nonfrivolous arguments for a downward variance.

### B. Procedural Reasonableness

Lucas argues that his sentence is procedurally unreasonable because the court failed to address his arguments for a substantial downward variance. Lucas admits that he did not object to any procedural defects below, so this court reviews for plain error. *See United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010). Even though plain error presents a high hurdle for defendants, "[w]hen a defendant raises a particular, nonfrivolous argument in seeking a lower sentence, the record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it." *Id.* at 803 (alterations in original) (quoting *United States v. Gapinski*, 561 F.3d 467, 474 (6th Cir. 2009)); *id.* at 805 (holding that the district court's failure to acknowledge defendant's nonfrivolous argument about a sentencing disparity between her and a co-conspirator amounted to plain error); *see also Rita v. United States*, 551 U.S. 338, 357 (2007) ("Where the defendant or prosecutor presents nonfrivolous reasons for imposing a different sentence . . . the judge will normally go further and explain why he has rejected those arguments.").

Meanwhile, on remand, the district court thought that "one issue need[ed] to be addressed"—namely, that the district court needed to explain adequately its "assessment of the [§] 3553(a) factors when imposing [Lucas's] sentence." R. 329, Resentencing Hr'g Tr., PID 3242-43; *see* 18 U.S.C. § 3553. That is not correct—the prior sentencing suffered from two procedural problems.

The sentencing judge needed *both* to address Lucas's nonfrivolous arguments *and* to explain the sentence with reference to the § 3553 factors. We previously held that the district court fell short of § 3553's procedural requirements because "the judge failed to give due consideration

to Lucas's § 3553-based arguments and to adequately explain his reasons for rejecting them, and that he failed to justify his sentence by reference to the § 3553(a) factors." *Merriweather*, 728 F. App'x at 526; *see also id.* ("The court must go one step further and explain its sentence, *including its reasons for rejecting the defendant's arguments*.") (emphasis added). The arguments not addressed by the sentencing judge the first time around included: "Lucas's difficult childhood, his mental health issues, the non-violent nature of his crime, the government's alleged misuse of a § 851 enhancement, and his alleged minor role in a relatively small-scale conspiracy." *Id.* at 527.

On remand, after listening to statements from both parties at Lucas's second sentencing hearing, the district judge explained his reimposition of the 180-month sentence in a short, one-and-a-half page soliloquy. The judge listed and endorsed the factors in § 3553(a)(2), noted his understanding of Lucas's "troubled childhood," listed Lucas's past convictions, discussed the seriousness of the opioid epidemic, and connected the chosen sentence to the need to deter Lucas in a way that past convictions had not. R. 329, Resentencing Hr'g Tr., PID 3263-64. Lucas claims that the judge again failed to address the nonfrivolous arguments Lucas raised for a substantial downward variance, including his difficult childhood and resulting mental health issues, the non-violent nature of his crime, the government's "misuse" of the § 851 enhancement, Lucas's lack of success as a drug dealer, and the "arbitrariness" of the drug type and quantity that factored into the guidelines range.

We agree. We previously remanded this case for resentencing because the district court failed to explain itself. One would think, then, that the district court would have taken more care on remand. But it did not. Lucas's sentence is procedurally unreasonable for one of the same reasons that we identified the first time we saw this case: the district court failed to address Lucas's

nonfrivolous arguments or include its reasons for rejecting those arguments. *See Merriweather*, 728 F. App'x at 526–27.

To be sure, the district court made "at least some reference to the § 3553 factors," but it did not "includ[e] its reasons for rejecting [Lucas's] arguments." *See id.* at 526. The sentencing judge stated that he "gave this case a lot of consideration last time, and [he had] considered it considerably since then," and imposed the same 180-month sentence. R. 329, Resentencing Hr'g Tr., PID 3263-64. The judge then explained that his choice of sentence was "buttressed" by the § 3553(a)(2) factors in particular, and he made reference to Lucas's criminal history, the "serious pill epidemic in the country," and Lucas's "past sentences, which were often probation[ and] were not enough to deter Mr. Lucas from continuing with his criminal activities." *Id.*; *see* 18 U.S.C. § 3553(a)(1) ("history and characteristics of the defendant"). The district court therefore cured one deficiency from the first sentencing, but it failed to cure the second. Any mention of the arguments noted in our prior opinion is virtually absent from the resentencing transcript. Consequently, Lucas's sentence is, again, procedurally unreasonable. *Merriweather*, 728 F. App'x at 527; *Wallace*, 597 F.3d at 805 (holding that "[t]his failure to even acknowledge Defendant's argument[s] mandates remand in this case," and that this error was plain).

This becomes even more disappointing when considering that some of this court's cases suggest that a district court can clear this low procedural hurdle by merely *acknowledging* the defendant's nonfrivolous arguments. *See United States v. Liou*, 491 F.3d 334, 340 (6th Cir. 2007) (reasoning that "the district court offered clear reasons for its sentence" and that "the district court *did* acknowledge [defendant's] family and business circumstances at the sentencing hearing"); *United States v. Crowell*, 493 F.3d 744, 751 (6th Cir. 2007) (reasoning that the district court "explicitly announced its consideration of [defendant's] mental capacity"). Of course,

"a sentencing judge is not required to explicitly address every mitigating argument that a defendant makes, particularly when those arguments are raised only in passing." *United States v. Madden*, 515 F.3d 601, 611 (6th Cir. 2008). *But see id.* at 614 (Moore, J., dissenting) (arguing that the sentencing judge "failed to mention or address one of [defendant's] *central* arguments for a lower sentence") (emphasis added). Indeed, only when an argument is not frivolous does a district court need to acknowledge or address it.[4]

We explicitly listed those arguments in our prior opinion for the district court, but even the minimum standards required by our precedent were not met. Although the district court sentenced Lucas below the guidelines range, i.e., 180 months of imprisonment, Lucas requested a 96- to 120-month sentence. And Lucas supported that request with well-developed arguments. Lucas therefore raised nonfrivolous arguments, but based on this record, we cannot say that the district court acknowledged or addressed them.

We do not relish sending this case back for yet another resentencing. Our precedent, our prior opinion in this case, and this record nonetheless compel us to conclude that we must do so.

**IV.**

For these reasons, we **AFFIRM** the judgment with respect to Lloyd Montgomery but **VACATE** Dominique Lucas's sentence and **REMAND** to the district court for resentencing.

---

[4] This principle is well established in a long line of cases in this circuit. *See, e.g.*, *United States v. Dyer*, 908 F.3d 995, 1007–08 (6th Cir. 2018); *Wallace*, 597 F.3d at 803, 805; *Gapinski*, 561 F.3d at 474; *United States v. Lalonde*, 509 F.3d 750, 770 (6th Cir. 2007); *United States v. Jones*, 489 F.3d 243, 251 (6th Cir. 2007); *United States v. Richardson*, 437 F.3d 550, 554 (6th Cir. 2006); *see also United States v. Blackwell*, 459 F.3d 739, 774 (6th Cir. 2006) (describing this principle as "black letter law" in the Sixth Circuit), *accord United States v. Gunter*, 620 F.3d 642, 645–46 (6th Cir. 2010).